**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Manuel BINKER, a/k/a Manolo,**
**Defendant-Appellant.**

No. 85–3614.

United States Court of Appeals,
Fifth Circuit.

Aug. 5, 1986.

Richard A. Sharpstein, Coconut Grove, Fla., Melvin S. Black, Miami, Fla., for defendant-appellant.

Marilyn Barnes, Asst. U.S. Atty., John Volz, U.S. Atty., Joseph I. Giarrusso, Jr., Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before GARWOOD and HILL, Circuit Judges, and WILL,* District Judge.

GARWOOD, Circuit Judge:

Appellant Manuel Binker appeals his conviction of conspiracy to import and to pos-

---

* District Judge of the Northern District of Illinois, sitting by designation.

sess with intent to distribute more than one thousand pounds of marihuana. Binker was indicted with five others who pleaded guilty prior to trial. Counts I through IV of the indictment concerned a scheme to import marihuana on the vessel MARENOSTRUM; counts V and VI concerned a scheme to import marihuana aboard the vessel HARRY I. Binker was acquitted on counts I through IV, but was convicted on counts V and VI for the conspiracy involving the HARRY I.

Binker raises three claims of error on appeal. First, he objects to the government's use of the plea agreements of the co-conspirators that testified against him. He also claims that the government unlawfully intimidated one witness to testify against him. Finally, Binker challenges the admission of testimony concerning evidence seized aboard the HARRY I, because this evidence was destroyed prior to trial. Finding Binker's arguments present no reversible error, we affirm his conviction.

**Facts and Proceedings Below**

On June 23, 1984, a patrolling United States Coast Guard cutter came across the disabled vessel HARRY I, which was anchored on the high seas taking on fuel from a smaller vessel beside it. The HARRY I indicated that its fuel had been contaminated by water. After receiving permission from the master of the HARRY I, the Coast Guard boarded the vessel and obtained documents denoting that mangoes were the ship's only cargo and that the HARRY I had departed from Haiti over a month before. The Coast Guard searched the vessel and discovered 405 bales of marihuana in the cargo hold camouflaged by a load of rotting mangoes. In addition, they initially found thirteen persons aboard, all of South American nationality, and eventually discovered a fourteenth person, an American named Robin Rhodes.

The HARRY I was seized and escorted to Key West, Florida, where the vessel, its contents, and the persons aboard were turned over to the custody of the Drug Enforcement Administration (DEA). The DEA's search of the HARRY I produced 329 bales of marihuana weighing approximately 16,450 pounds (there was no explanation for the discrepancy in the number of bales), some rotting fruit, and straw goods. Ten random samples taken from the marihuana and one large bale were sent to the DEA lab for testing. All of the marihuana seized from the HARRY I, including the lab samples, was destroyed prior to trial. A DEA chemist testified at trial that he examined the bale and the samples and found that they were marihuana.

Rhodes and the thirteen other persons found aboard the HARRY I were arrested upon their arrival in Florida. Rhodes decided to cooperate with the government, and the information he provided eventually led to Binker's indictment. On November 15, 1984, Binker and others were indicted for conspiracy to import in excess of one thousand pounds of marihuana aboard the vessel HARRY I and conspiracy to possess with intent to distribute the marihuana. A final superseding indictment was returned against Binker and five others on April 18, 1985, which charged Binker under counts V and VI with the HARRY I conspiracy and, in counts I through IV, charged him with conspiracy to import and conspiracy to possess with intent to distribute in excess of one thousand pounds of marihuana aboard the vessel MARENOSTRUM, and with the substantive counts of importation of and possession with intent to distribute the marihuana. The other defendants named in this indictment and co-conspirators charged in other districts all pleaded guilty, leaving Binker the only defendant to proceed to trial. Most of the evidence against Binker came from co-conspirators who testified pursuant to plea agreements.

Faiz Sikaffy, Binker's partner in several ostensibly legitimate businesses, was a primary witness for the government. Sikaffy testified that he was a partner with Binker in marihuana smuggling ventures involving the MARENOSTRUM and the HARRY I.[1]

---

**1.** Because Binker was acquitted on the counts concerning the MARENOSTRUM, we will for

Binker and Sikaffy purchased the HARRY I, a refrigerated vessel, initially for the purpose of importing seafood. Sikaffy testified that in March 1984 he and Binker decided to use the vessel to import marihuana. Sikaffy's role was to transport the marihuana, while Binker's was to sell it. Sikaffy hired an airplane pilot, William Earle, to maintain aerial watch over the HARRY I and to communicate with the ship's captain. Miguel Canahuati's role was to perform various odd jobs concerning the importation, including a trip to Colombia to check on the crop. Rhodes was the ship engineer of the HARRY I, and also bought smaller boats to carry the marihuana from the HARRY I to the United States. Sikaffy testified that Binker furnished some of the money used to purchase the small boats, through a courier named Miguel Suriano.

Sikaffy further testified that in May 1984 the HARRY I was anchored in Haiti prepared to set sail and to receive the load of marihuana from a Colombian ship at sea. At that time, Binker, Sikaffy, Earle, and Suriano traveled to Haiti to prepare for the departure of the HARRY I. In Haiti, Binker and Suriano bought mangoes and straw products to hide the marihuana load. After the HARRY I left Haiti, it met with the Colombian ship and received the marihuana.

Sikaffy then joined other co-conspirators in Louisiana because, under the original plan, the HARRY I was to be off-loaded about two hundred miles from the coast of Louisiana. Binker apparently returned to Florida. Because Sikaffy and others began to suspect that one of the participants was an informant, they changed their plans and decided to meet the HARRY I off the coast of Florida. Sikaffy described ship-to-shore telephone calls from the HARRY I to him and to Binker during this time, which the government corroborated with telephone records and other witnesses. Sikaffy explained that he and Binker were able to arrange for the off-loading of some of the marihuana onto the vessel SEACRUST.

This marihuana eventually was sold to Hector Perez. Before they could unload any more of the marihuana, the HARRY I and its crew were seized. Sikaffy stated that he and Binker then obtained an attorney for Robin Rhodes and the crew of the HARRY I. This attorney was paid by Josefina Caporale, Sikaffy's personal secretary, with money that she obtained from Binker.

Sikaffy's description of the HARRY I smuggling scheme was corroborated by other witnesses. Perez testified that in March 1984 he met with Binker in Florida to discuss the importation. Perez explained that he initially went to Louisiana to await the arrival of the marihuana, but after the difficulties arose with off-loading there, he returned to Florida. Perez was subsequently informed that the marihuana had been unloaded and was available. He received approximately 6,800 pounds of marihuana for which he made several cash payments to Binker.

Suriano testified that when Binker and Sikaffy purchased the HARRY I they informed him of their intention to use it for marihuana importation. He also stated that he was in Haiti during the preparations for the voyage of the HARRY I, and that he and Binker bought the mangoes and straw products to conceal the marihuana aboard the HARRY I. He further testified that he received money from Binker, which he delivered to Rhodes for the purchase of the small boats.

Earle testified that he flew to Haiti and gave Binker and Suriano cash for the purchase of the mangoes and straw products. According to Earle, Binker explained to him that the smell of the mangoes would hide the smell of the marihuana, and that the straw products would take up a lot of space without weighing much. Earle also described his aerial observation of the meeting at sea between the SEACRUST and the HARRY I. Earle stated that he was accompanied by an employee of Binker's, and that he heard the employee call

the most part describe the testimony only as it relates to the HARRY I.

Binker to report on the successful rendezvous of the two vessels when the marihuana was off-loaded. Furthermore, Earle was present at meetings between Sikaffy and Binker when they discussed the importation and observed Binker pay Sikaffy several hundred thousand dollars in cash.

Canahuati described his trip to Venezuela and Colombia to inspect the marihuana that was to be imported on the HARRY I. He also recounted his subsequent trip to Florida to report to Sikaffy and Binker about the marihuana.

The testimony of Caporale, Sikaffy's personal secretary, corroborated some of Sikaffy's account of Binker's involvement in the HARRY I importation scheme. She related that she received ten thousand dollars cash from Binker and delivered it to the attorney for the crew of the HARRY I. She also stated that on previous occasions Binker had delivered large sums of cash to Sikaffy.

Each of these witnesses testified pursuant to a plea agreement, which the government introduced into evidence over appellant's objection. The government presented further evidence corroborating Binker's involvement in the HARRY I smuggling venture, including Rhodes' account of meetings with Sikaffy and Binker and of the events that occurred while he, Rhodes, was aboard the HARRY I. Although Rhodes testified pursuant to a plea agreement, the government did not offer his agreement into evidence.

After the close of the government's case, several character witnesses testified on behalf of Binker. Then, Binker took the stand and explained that he had been in the seafood business with Sikaffy but had known nothing about the marihuana importation. Binker testified that he purchased the mangoes and straw products as a favor

to Sikaffy and that he received several phone calls from the crew of the HARRY I when the vessel developed engine problems. Binker denied knowledge of the marihuana aboard the HARRY I, but stated that he referred Sikaffy to a lawyer when he learned that the HARRY I had been seized.

Binker was convicted of conspiracy to import and to possess with intent to distribute in excess of one thousand pounds of marihuana in violation of 21 U.S.C. §§ 846, 963. On count V, Binker was sentenced to five years' imprisonment and fined $15,000. He received a fifteen-year sentence on count VI to run consecutively with his count V sentence, plus a fine of $125,000.

## Discussion

### Plea Agreements

Binker contends that the government's use of its witnesses' plea agreements constituted impermissible vouching for the credibility of those witnesses. He argues that the admission of the Caporale plea agreement standing alone impermissibly vouched for her credibility. He also claims that the admission of the plea agreements of five other witnesses (Sikaffy, Perez, Suriano, Earle, and Canahuati) in connection with the government's questioning and closing argument was improper vouching for the credibility of the government witnesses. The latter five plea agreements provide (1) that the witness testify truthfully, (2) that the witness will be prosecuted for false statements or perjury if he fails to testify truthfully, and (3) that the prosecution retains the right to verify the statements and testimony given by the witness. The Caporale agreement, however, contains significantly different language, asserting that the government had independently verified the truth of her statements.[2]

2. The relevant provision of Caporale's plea agreement states:

"It is further understood that you shall at all times give complete, truthful and accurate information and testimony. Should it be judged by this office that you have intentionally given false, incomplete or misleading testimony or information, or have otherwise violated any provision of this agreement, you shall be subject to prosecution in this district for any federal criminal violation of which this office has knowledge and including, but not limited to, perjury and obstruction of justice.... *Thus far, we have found that what you have told us has been the*

We first address Binker's challenge concerning the district court's admission of the unredacted plea agreements of Sikaffy, Perez, Suriano, Earle, and Canahuati. The government's attempt to bolster a witness by vouching for his credibility constitutes error when the prosecutor's statements "might reasonably have led the jury to believe that the prosecutor possessed extrinsic evidence, not presented to the jury, that convinced the prosecutor of the defendant's guilt." *United States v. Leslie,* 759 F.2d 366, 378 (5th Cir.1985) (citations omitted), *rev'd on other grounds,* 783 F.2d 541, 542 n. 1 (5th Cir.1986) (en banc) (reinstating panel opinion concerning admission of the plea agreements), *petition for cert. filed,* 54 U.S.L.W. 3811 (U.S. June 10, 1986) (No. 85–1961). The district court's mere admission of the plea agreements is not erroneous because the three above-mentioned provisions therein are virtually identical to those contained in the plea agreements the admission of which we approved in *Leslie. Id.* at 377–78. Recognizing that these agreements standing alone are not improper, Binker claims that the government's focus on the agreements in its direct and redirect examination of the witnesses and in its closing argument indicated to the jury that the prosecutors had verified the witnesses' accounts and believed that they were telling the truth.

■ Having reviewed the record, we determine that the government's questioning of the witnesses about their plea agreements was not improper. The government merely elicited from each witness a description of the witness' promise to testify truthfully in exchange for reduced charges and the government's promise to inform the sentencing judge of the witness' cooperation. In each instance, the government offered the plea agreement into evidence only on redirect questioning, after the defense had cross-examined the witness about the agreement in a manner that uti-

lized the agreement to challenge the witness' credibility. Although *Leslie* addressed only the admission of the written agreements, we find that the witnesses' limited reiteration of the promises in the plea agreements in this instance does not amount to improper vouching under the standard of *Leslie,* because the questioning did not suggest to the jury that the government possessed any extrinsic evidence supporting the witnesses' statements.[3]

The government's closing argument, however, presents a more difficult question. In its initial or opening closing argument to the jury, the government responded to the defendant's suggestions, made in cross-examination, that the witnesses were lying because they had signed plea agreements. The government argued in this connection:

"Ladies and gentlemen, look at those plea agreements, do these plea agreements provide a motive to lie, or do they provide a motive to tell the truth? These witnesses said that if they lied, they would be charged with perjury, ladies and gentlemen, that's part of their plea agreement. Their plea agreement said if they lied, that plea agreement could be withdrawn, they could stand trial, the deal was off. Ladies and gentlemen, is that a motive to lie, or is that a motive to tell the truth, to testify truthfully.

"And you heard about one such individual, Miguel Suriano, he was in a tough situation, and he finally came forth and told the truth, told what he knew.

" . . . .

"If [these witnesses] really wanted to lie, if they were out there testifying to save their own skins, why didn't they really cook up a story, no way out? Because they were telling the truth, ladies

---

*truth and we have been able to independently corroborate (verify) it."* (Emphasis added.)

**3.** Binker also challenges the government's questioning of Rhodes about his plea agreement, although the agreement was not offered or ad-

mitted into evidence. We find that the government's questioning of Rhodes about the content of his plea agreement was not impermissible vouching for the reasons described above.

and gentlemen, that's why, they only said what they knew." [4]

In his closing argument, appellant's counsel argued that every witness who testified pursuant to a plea bargain "should be subjected to perjury, because we've heard, each and every one of them, change their story and lie from that witness stand." Defense counsel also argued that "possibly next spring Mr. Sikaffy [a government plea bargain witness] will be sitting in Honduras." Counsel suggested the witnesses were coerced by the government.[5] In the government's rebuttal to the appellant's closing argument, the government again addressed the witnesses' plea agreements:

"[Government counsel] Now, the one thing that's all going to get them back to where they were facing the original time they were facing, they were told, and you decide from listening to those people on the stand, whether or not they believed it, if they were lying the deals were off. You have had evidence whether or not the Government enforced that, you decide—

"MR BLACK [defense counsel]: Your Honor, I object to the argument.

"THE COURT: Objection overruled.

"[Government counsel] You decide if these people believed it and were acting accordingly. And in fact, lying is one

thing that is going to get them right back where they were before."

The prosecution's role in closing argument is generally limited to assisting the jury in "analyzing, evaluating, and applying the evidence." *United States v. Shaw,* 701 F.2d 367, 390 (5th Cir.1983) (quoting *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981)), *cert. denied,* 104 S.Ct. 1419 (1984). The prosecutor may argue the conclusions that the jury should draw from the evidence, but he may not express his personal opinion on guilt or innocence or the credibility of the witnesses. *Id.; United States v. Garza,* 608 F.2d 659, 662–63 (5th Cir.1979). A prosecutor certainly "may not make explicit personal assurances of a witness's veracity." *Leslie,* 759 F.2d at 378. Nevertheless, when the defense counsel attacks the credibility of a government witness, the prosecutor is entitled to make a fair response in rebuttal. *United States v. Nixon,* 777 F.2d 958, 972 (5th Cir.1985); *United States v. Nanez,* 694 F.2d 405, 410 (5th Cir.1982), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983); *see also United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1044–46, 84 L.Ed.2d 1 (1985).

The application of these principles to comments concerning a witness' plea

---

**4.** No objection was made to any of this argument until after the conclusion of both the defendant's closing argument (during which there was a recess between the arguments of the two defense counsel) and the government's rebuttal closing argument. Defense counsel then made the following objection apparently directed to the government's initial or opening closing argument, *viz.*:

"Okay, the Government argued the truthful provision, the requirement of the truthfulness in the plea agreement a number of times and I consider that to be vouching and I object to all those references.

"Finally, at one point there was a phrase where Mr. Montgomery [government counsel] said because they were telling the truth, I consider that to be vouching. So, I would object to those, all those references to the plea agreement in vouching, in terms of final argument."

The court never ruled on this objection, and (apart from the objection itself) was never asked to; nor did defense counsel make any motion requesting any relief (such as an instruction to

the jury or a mistrial) in connection with the making of this objection.

**5.** Defense counsel's argument in this connection included the following:

"And you have got to ask yourselves whether it was, perhaps, a little coercion, not necessarily Mrs. Barnes, not necessarily the agents, but maybe there is a combination of things. When people are threatened with long periods of time in jail for their activity, they certainly come to a point where they say to themselves gee, what do these people want to hear, what can I give them? And they keep saying well, there is only one of you left, there is Binker left. And Binker, we think had something to do with this, but we need some help because we don't have anything. ...

"...

"... [T]hey are all looking for favors, or favorable testimony to the Court and stuff, they cooperated that they did the little bit as far as convicting another person. So, there is a lot of motive for them to change their story."

agreement can be difficult. Typically, the fact that a government witness has made a plea bargain with respect to the events at issue is a matter which the defense desires to heavily emphasize as adversely affecting the witness' credibility, giving him an ulterior motive to falsely implicate the defendant. If the terms of the plea bargain are proper, as we held in *Leslie,* then certainly it is appropriate for the government to *respond* by asserting that the agreement provides an incentive to tell the truth rather than to lie. Nor is it reasonable that the government be made to appear as if it were hiding the plea agreement or its terms by being prevented from mentioning them until they are first brought out by the defense, at least assuming that the defense does not waive the right to bring those matters out. Normally, if the agreement is gone into, all proper terms relevant to the witness' motive may be disclosed. The greatest difficulty is presented by the provision that the government has the right to verify the witness' testimony. We sustained such a provision in *Leslie.* In this connection, the harm to be avoided is the jury's belief that the government in not withdrawing the witness' plea agreement has relied on evidence not admitted at trial. Therefore, the prosecution may not initiate the claim that the witness must be telling the truth or otherwise his plea agreement would have been withdrawn. Moreover, once the defense has suggested that the witness is prompted to lie by the existence of the plea agreement, the prosecution may not indicate its belief in the witness' veracity any more than is reasonably necessary under the circumstances in responding to the defense; the government may then suggest that the witness should be believed, but *not* because the government has independently verified the witness' account.

■ In the present case, appellant's counsel cross-examined each of these five witnesses concerning his plea agreement, suggesting that the witness was lying because of the plea agreement. The prosecution was accordingly justified in stating in the initial portion of its closing argument

that the plea agreements provided an incentive to tell the truth. Then, appellant in his closing argument countered that the government witnesses were lying and suggested that the witnesses had succumbed to threats or coercion on the part of the government under the plea agreements. In rebuttal, the prosecution properly suggested that, contrary to the defense arguments, the plea agreements gave the witnesses a motive to testify truthfully.

■ However, one assertion in the prosecution's rebuttal is more questionable. This is the statement "[y]ou have had evidence whether or not the Government enforced that," apparently referring to the government's right under the plea agreement to verify statements or testimony given by the plea bargaining witness. This comes perilously close to improper vouching by suggesting that the witness should be believed because the government had by other means independently verified his testimony. Nevertheless, in the present case there is a special context in which this remark must be considered. As noted below in the discussion of appellant's claim of witness intimidation, *appellant* had put in evidence before the jury stipulated testimony of Sikaffy that Assistant United States Attorney Barnes had, some days before trial, suggested to Sikaffy that he tell Suriano, also a plea bargaining witness, that Barnes thought Suriano's grand jury testimony was false and inferred that the government might withdraw from its plea agreement with Suriano on that account. In his grand jury testimony, Suriano had, among other things, said, contrary to his trial testimony, that he did not know whether Binker was aware that the purpose of the mangoes and straw products was to conceal the marihuana on the HARRY I. This inconsistency was of course brought out at trial. The defense in its closing argument relied on this, and on the above-referenced stipulated testimony of Sikaffy concerning what Barnes told him, in order to discredit the veracity of Suri-

ano's trial testimony.[6] The prosecution's referenced remark in its rebuttal argument can thus be seen as replying to the argument that the Barnes "threat" made Suriano testify falsely at trial, by urging that its tendency would rather be to influence him to testify truthfully. In this light, the argument has more of a legitimate responsive character as to the likely effects of such a statement on Suriano, as opposed to being an improper claim that Suriano's trial testimony should be believed because the government has evidence, not before the jury, showing that, regardless of Suriano's motivation, what he related at trial was factual.

Furthermore, an improper argument by the prosecution does not require reversal of a conviction unless it prejudicially affected substantial rights of the defendant. *Nixon*, 777 F.2d at 972–73; *Garza*, 608 F.2d at 663. In assessing the degree of prejudice resulting from a prosecutor's closing argument, we may consider the strength of the evidence against the defendant and the district court's instructions to the jury. *United States v. Phillips*, 664 F.2d 971, 1031 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Although the district court overruled appellant's objection to the rebuttal argument and thus did not provide an immediate curative instruction, *see Shaw*, 701 F.2d at 391; *Dorr*, 636 F.2d at 121, the court had explained to the jury prior to the closing arguments that "what the lawyers say is not evidence." The court admonished the jury to rely on their own recollections of the evidence presented at trial. *Phillips*, 664 F.2d at 1031. In its charge to the jury shortly following the closing arguments, the court instructed the jury that a plea agreement's requirement that the witness testify truthfully does not mean that the witness has in fact testified truthfully and that the government may not vouch for the credibility of its witnesses. Moreover, the evidence against Binker was compelling.

While the government in its closing argument came perilously close to improper vouching by suggesting that the witness should be believed because the government had by other means independently verified his testimony, we conclude that, under all the circumstances, the government's closing arguments present no reversible error.

We now turn to Binker's challenge to the admission of the Caporale plea agreement. In denying Binker's motion for reconsideration of his motion for new trial, the district court found that Binker had failed to timely and specifically object to the distinctive verification language in the Caporale agreement.

On May 30, 1985, Binker filed a pretrial motion *in limine* requesting that all evidence of the plea agreements be redacted and modified to avoid any reference to the following requirements: that the witness testify truthfully, that the witness would be prosecuted for perjury if he failed to testify truthfully, and that the prosecution retained the right to verify the statements of the witnesses. Appellant claimed that the government's use of evidence of these three requirements would improperly vouch for the credibility of its witnesses. Appellant attached to his motion *in limine* the plea agreement of Rhodes, which was never offered into evidence. This agreement had the same provisions as did the other agreements, except for Caporale's, and did not have the objectionable vouching language of the latter (*see* note 2, *supra*). Although it is not clear exactly when the defense counsel received the Caporale agreement, the prosecution and the defense agree that the document was provided to the defense sometime during the period from May 30, 1985, to June 2, 1985. The trial began on June 3. Although appellant may not have received the Caporale agreement until after he had argued his pretrial

---

**6.** When questioned about this, Suriano testified that Sikaffy had told him (Suriano) prior to trial and after Suriano's grand jury testimony "that he [Sikaffy] thought I was lying and he said, you might as well tell the truth" and that Suriano then decided to do so and "talked to Miss Barnes about it." Suriano denied that somebody from the government told him his plea agreement was in jeopardy because they thought he had lied to the grand jury.

motion, he failed to bring the distinctive language of the Caporale agreement to the district court's attention at any time prior to or throughout the trial. Appellant's counsel objected to the admission of each plea agreement, often explicitly renewing his pretrial objection. When Caporale's plea agreement was admitted into evidence, appellant's counsel stated: "Subject to the same objection." Appellant now asserts that the district court did not permit him to make specific arguments when objecting to the plea agreements. However, appellant's counsel never apprised the district court that he was offering any objection different from that raised in the motion *in limine.* Finally, Binker again challenged the plea agreements in a motion for new trial, but failed to attach a copy of the Caporale agreement or to in any way refer to its distinctive language. Binker's first reference to the offensive language of the Caporale agreement was in his motion for reconsideration of the denial of his motion for new trial. Until Binker's motion for reconsideration, his recurring objections focused on the three provisions common to all six plea agreements without distinguishing the Caporale agreement.

■ The district court did not err in finding that Binker failed to specifically object to the Caporale agreement as required by Rule 51 of the Federal Rules of Criminal Procedure.[7] Because Binker's complaint of the distinctive verification language in the Caporale agreement is significantly different from his complaint as to the other plea agreements, he was obliged to inform the district court of the specific ground of his objection to warrant exclusion or redaction of the Caporale agreement. We therefore review the admission of this agreement under the plain error standard. Fed.R. Crim.P. 52; *United States v. Canales,* 744 F.2d 413, 431 (5th Cir.1984). Plain error supports reversal only if "the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." *Canales,* 744 F.2d at 431 (citations omitted).

■ The Caporale plea agreement states that, as of the time of its execution, the government had in fact independently verified the witness' statements. Therefore, the admission of the unredacted plea agreement constituted impermissible vouching for the credibility of the government witness. Nevertheless, we find that reversal is not warranted under the "plain error" rule. To begin with, at no time was there ever any reference whatever before the jury, by any witness or attorney or the court or otherwise, to this aspect of the Caporale agreement. It simply played no part at all in the trial. It appears obvious that it was something all concerned wholly overlooked. Further, the evidence against Binker was extremely strong. Caporale's testimony merely corroborated testimony given by the other government witnesses. Caporale lacked the direct involvement and intimate knowledge of the conspiracy exhibited by the other government witnesses. Her statements concerning payments made by Binker to Sikaffy and to the attorney hired for the crew of the HARRY I were confirmed by Sikaffy, Perez, and Earle.[8]

---

7. Fed.R.Crim.P. 51 provides:

"Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor...."

8. Appellant contends that Caporale's testimony must have been crucial, because she did not testify about the MARENOSTRUM, while the other witnesses who tied appellant to the HAR-

RY I likewise also implicated him respecting MARENOSTRUM. The jury acquitted appellant on the MARENOSTRUM counts, and appellant thus reasons that the jury disbelieved all the government's witnesses who tied him to the HARRY I except Caporale. This theory is not persuasive. As noted in the text, Caporale's testimony about the HARRY I was not particularly extensive, and there was a great deal of other evidence tying appellant to the HARRY I. Further, Caporale did give some, though lesser, testimony respecting the MARENOSTRUM. Finally, the real difference between the MARENOSTRUM and the HARRY I was that when the customs agents searched the former on its arriv-

Furthermore, the district court clearly instructed the jury that the government could not vouch for the credibility of its witnesses. Although before its admission in evidence the Caporale plea agreement should have been redacted to eliminate its recital that the government had in fact independently verified Caporale's story as being the truth, the failure to do so did not result in a miscarriage of justice or seriously affect the fairness of the proceedings here. Consequently, reversal is not mandated under the plain error rule.

Lest the message of this opinion be misconstrued, we reiterate our statements in *Leslie* that any attempt by a prosecutor to bolster a witness by vouching for his credibility constitutes error if the statements made "might reasonably have led the jury to believe that the prosecutor possessed extrinsic evidence, not presented to the jury, that convinced the prosecutor of the defendant's guilt," and that a prosecutor "may not make explicit personal assurances of a witness's veracity." *Leslie,* 759 F.2d at 378. Although we have concluded here that, under all the circumstances, the prosecutor's closing argument and the introduction of the improperly unredacted Caporale plea agreement do not constitute reversible error, this is not to be interpreted as warranting use of plea agreements to vouch for the credibility of a witness contrary to our above-noted admonitions in *Leslie.* Prosecutors have a responsibility to refrain from such conduct and we assume that they will do so.

*Witness Intimidation*

Binker also contends that the prosecution violated his right to due process by substantially interfering with a witness' free and unhampered choice to testify. As noted, Suriano, an alleged co-conspirator, entered a plea agreement with the government. Before the grand jury, Suriano testified that he did not know whether Binker was aware of the purpose of the mangoes and straw products in camouflaging the marihuana aboard the HARRY I. Yet, at

trial Suriano explained that he had testified falsely at the grand jury to protect Binker, and that he and Binker had purchased the mangoes and straw products for the purpose of concealing the marihuana. The prosecution and the defense agreed to the following stipulation, which the defense read to the jury after the government had rested and as a part of the defense case:

"It is stipulated that if Faiz Sikaffy was called to the stand in the case, he would testify that Assistant United States Attorney Marilyn Barnes told him on Wednesday, May 29, 1985 [a few days before trial], that he could tell Miguel Suriano, if you saw him in the jailhouse that night, that Marilyn Barnes said he was lying, and as far as she was concerned, Suriano could get ready to go to trial, the Government just wasn't going to tolerate such nonsense."

Binker argues that this message intimidated Suriano into testifying against him at trial.

We initially observe that appellant never sought any relief at trial on the basis of this stipulated testimony or in respect to the matters thereby reflected. He did not move to strike Suriano's testimony or any of it, or request any jury instruction or move for a mistrial. A party should ordinarily not be allowed to gamble on the verdict. Appellant's complaint in this respect simply comes too late, unless the above-noted plain error standard is met. We hold that it is not.

■ We have held that substantial government interference with a defense witness' free and unhampered choice to testify may violate the due process rights of the defendant and require reversal of the defendant's conviction without regard to prejudice. *United States v. Whittington,* 783 F.2d 1210, 1219 (5th Cir.1986); *United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980); *United States v. Hammond,* 598 F.2d 1008, 1012–13 (5th Cir.), *relief modified on reh'g,* 605 F.2d 862 (5th

al in Louisiana they found no marihuana, and the MARENOSTRUM accordingly was not

seized and *no* marihuana was *ever* recovered from it.

Cir.1979). However, the prosecutor's statements here were not made to a defense witness, but to a government witness who had agreed to testify pursuant to a plea agreement. The government must be permitted proper attempts to enforce its plea agreements, and in appropriate circumstances to inform its own witness that his plea agreement is in jeopardy. Here there is no suggestion that the government did not act in good faith. In addition, the government's statements here do not amount to the type of conduct that we have found to violate a defendant's due process rights. We have held that the "prosecutor's hands are not tied so tightly as to prevent good faith efforts to avert perjury." *Whittington*, 783 F.2d at 1219. The government did not engage in the type of intimidation that we have found objectionable in past cases. *See, e.g., Hammond*, 598 F.2d at 1012–14 (defense witness threatened during trial recess and subpoenaed before grand jury). We tend to the view that the government's message to Suriano was an entirely proper attempt to enforce the plea agreement. In any event, it is clear that the message was at least not an egregiously improper action in this respect, and did not violate Binker's due process rights so as to mandate reversal under the plain error rule.

### Destruction of Evidence

Finally, Binker asserts that the district court erred in refusing to exclude any references to the marihuana seized aboard the HARRY I, because the government destroyed this evidence prior to trial.[9] DEA Agent Putnoky, who took custody of the HARRY I when it arrived in Florida, testified at trial concerning the destruction of the evidence. The original indictment resulting from the arrest of those aboard the HARRY I was filed in the Southern District of Florida in July 1984. This indictment was dismissed in September 1984 at

the request of the United States Attorney for the Eastern District of Louisiana in an effort to protect Rhodes' status as an informant. Binker was initially indicted and arrested in November 1984. Putnoky admitted that he was aware that there was a continuing investigation in Louisiana, but that he did not know that the investigation required retention of the marihuana seized aboard the HARRY I. Therefore, upon being informed of the dismissal of the Florida indictment, he ordered the destruction of the marihuana between January 24, 1985 and February 5, 1985. He explained that the destruction of the bulk evidence as well as the random samples sent to the DEA lab was a routine procedure whenever a case was dismissed. There is nothing to suggest that this explanation was other than entirely truthful.

On February 25, 1985, after the destruction of the evidence, Binker filed a pretrial motion to preserve evidence. The prosecution was informed of the destruction in April 1985, and immediately informed appellant's counsel. Appellant submitted a pretrial motion to exclude all reference to the alleged marihuana at trial, which the district court denied. Binker renewed his motion at trial, but the district court overruled the motion, finding that the government was not in bad faith in destroying the marihuana. The district court also denied Binker's motion for mistrial based on his objection that the court had improperly vouched for the credibility of DEA Agent Putnoky, but offered a curative instruction to the jury that they might or might not believe Putnoky's testimony concerning the circumstances of the destruction of the marihuana. The district court also admitted testimony by a DEA chemist that he had tested the chemical composition of the evidence and confirmed that it was marihuana.

---

**9.** It is not clear whether appellant contests that marihuana was found aboard the HARRY I; he denied that he was aware of any marihuana aboard the vessel. The evidence is clear that marihuana was found on the HARRY I. There is absolutely no evidence that it did not have marihuana. Appellant's main argument is that the government's destruction of the evidence violated his due process right to a fundamentally fair trial.

In *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Supreme Court held that the government is constitutionally required to preserve evidence that might be expected to play a significant role in the suspect's defense. *Id.* at 2534. Evidence meets this "standard of constitutional materiality" if it possessed an exculpatory value that was apparent before the evidence was destroyed, and if the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* We have interpreted *Trombetta* to mean that "the mere possibility the evidence might aid the defense does not satisfy the constitutional materiality standard." *United States v. Webster*, 750 F.2d 307, 333 (5th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). In this case, the DEA procedure for testing the chemical composition of the evidence seized "was sufficiently accurate to render nugatory the exculpatory value of preservation." *Id.* (footnote omitted); *see Trombetta*, 104 S.Ct. at 2534. In addition, Binker had alternative means for challenging the government's contention that there was marihuana aboard the HARRY I. Binker had the opportunity to cross-examine all the witnesses who testified that the evidence seized aboard the HARRY I was marihuana, including the DEA chemist who testified about its chemical composition. *Trombetta*, 104 S.Ct. at 2535; *Webster*, 750 F.2d at 334. In light of the uncontradicted evidence offered by government witnesses that the HARRY I was carrying over one thousand pounds of marihuana when it was seized, we find that Binker has suffered no prejudice by the government's destruction of the evidence prior to trial. Furthermore, we find that the record supports the district court's determination that the government's destruction of the evidence was not in bad faith. *See Webster*, 750 F.2d at 333; *United States v. Herndon*, 536 F.2d 1027, 1029 (5th Cir.1976). Accordingly, we hold that the government's destruction of the evidence seized from the HARRY I did not violate Binker's due process rights.

## Conclusion

Finding that none of appellant's contentions presents reversible error, we affirm his conviction.

AFFIRMED.