TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON REMAND








NO. 03-07-00041-CR






The State of Texas, Appellant


v.


Jimmie Dale White, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT

NO. 1030299, HONORABLE JON N. WISSER, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 The issues remaining to be resolved in this proceeding are whether the record
reasonably supports the district court's dismissal of appellee Jimmy Dale White's murder indictment
on the grounds that dismissal was necessary to remedy infringements of White's rights under the
Due  Process Clause of the Fourteenth Amendment to the federal constitution and the Due Course
of Law Clause of the Texas Constitution. (1) Concluding that the record does not support dismissal
on those grounds, we reverse the district court's order dismissing the indictment and remand for
further proceedings.

 As noted in our prior opinion, White was indicted in June 2003 for the May 1986
murder of Michael Desjardins in Austin. In moving for dismissal of the indictment, White's primary
theory was that the seventeen-year pre-indictment delay had resulted in a deprivation of his
due process rights under the federal constitution. See United States v. Lovasco, 431 U.S. 783, 790-91 (1977); United States v. Marion, 404 U.S. 307, 325 (1971); Ibarra v. State, 11 S.W.3d 189, 193
(Tex. Crim. App. 1999). White also seemed to raise the argument that his federal due process rights
were violated by the State's failure to provide him exculpatory evidence as required under Brady
v. Maryland, 373 U.S. 83 (1963), or to preserve potentially favorable evidence, as required by
Arizona v. Youngblood, 488 U.S. 51 (1988). Further, with respect to both theories, White urged
that the Texas Due Course of Law provision (2) provides greater protection than its federal counterpart. 

The district court granted White's motion, stating in its judgment that it was relying "on the grounds
that under the provisions of the Texas and U.S. Constitutions the defendant is unable to obtain a
fair trial due to delay and the death of innumerable necessary witnesses." In its second, third, and
fourth points of error on appeal, the State argues that the record fails to support dismissal under any
of the three theories White advanced in the district court.


Standard of review

 "An appellate court must uphold a trial court ruling that is reasonably supported by
the record and is correct on any theory of law applicable to the case." State v. White, 306 S.W.3d
753, 757 n.10 (Tex. Crim. App. 2010). With respect to a trial court's dismissal of an indictment
in particular, we apply a bifurcated standard of review to determine whether the court "abused
its discretion." See State v. Moff, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); Guzman v. State,
955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We afford almost total deference to a trial court's
determination of historical facts that are supported by the record, particularly when such findings of
fact are based on an evaluation of witnesses' credibility and demeanor. Guzman, 955 S.W.2d at 89.
These fact findings may be explicit or, if the trial court did not make explicit fact findings, we are to
imply the necessary fact findings that would support the trial court's ruling if the evidence supports
them. See Gutierrez v. State, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). (3) We afford the same
amount of deference to a trial court's rulings applying law to fact to the extent those rulings turned
on an evaluation of credibility and demeanor. See Keehn v. State, 279 S.W.3d 330, 334 (Tex. Crim.
App. 2009). However, when resolution of a question of law does not turn on an evaluation of
credibility and demeanor, we review the issue de novo. Moff, 154 S.W.3d at 601.

 

Pre-indictment delay

 In its second point of error, the State argues that the district court abused its discretion
in dismissing White's indictment on the ground that it was necessary to remedy a due process
violation stemming from pre-indictment delay. The State contends that no evidence supports
dismissal on that theory.

 While limitations are the primary legal restriction against the prosecution of
unduly stale criminal charges, and Texas has no statute of limitations for a murder charge, "the
Due Process Clause has a limited role to play in protecting against oppressive delay." Ibarra,
11 S.W.3d at 193 (citing Lovasco, 431 U.S. at 789; Marion, 404 U.S. at 325). To obtain relief under
the Due Process Clause based on pre-indictment delay, the Court of Criminal Appeals has explained,
a defendant must first "show that the delay . . . caused substantial prejudice to his right to a fair trial."
Id. (citing Marion, 404 U.S. at 325; United States v. Gouveia, 467 U.S. 180, 192 (1984); Spence
v. State, 795 S.W.2d 743, 749 (Tex. Crim. App. 1990)). This requires a showing of actual prejudice,
not merely potential prejudice or prejudice that is presumed from the length of the delay. See
Michaelwitz v. State, 186 S.W.3d 601, 609 (Tex. App.--Austin 2006, pet. ref'd) (citing State
v. Crouch, 84 F.3d 1497, 1515 (5th Cir. 1996) (en banc)). Assuming prejudice is shown, the
defendant also must prove that the delay "was an intentional device used to gain a tactical advantage
over the defendant." Ibarra, 11 S.W.3d at 193.

 The State challenges whether there is evidence to establish either requirement. On
appeal, while maintaining that he also satisfied the purpose requirement, White focuses mainly
on the prejudice requirement, emphasizing that the district court concluded in its dismissal order
that White "is unable to obtain a fair trial due to delay and the death of innumerable necessary
witnesses." With this, White stresses the (sometimes) deferential nature of the abuse-of-discretion
standard of review. See, e.g., Walters v. State, 247 S.W.3d 204, 217 (Tex. Crim App. 2007)
(regarding admission or exclusion of evidence, "as long as the trial court's decision was within the
zone of reasonable disagreement and was correct under any theory of law applicable to the case, it
must be upheld."); Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (suggesting
that abuse of discretion standard affords trial courts a "limited right to be wrong" in regard to matters
within their discretion, "so long as the result is not reached in an arbitrary or capricious manner.").
White urges that "the State has not even argued, much less demonstrated, that Appellee can get a
fair trial," and that we must defer to that determination because it was not arbitrary or outside the
"zone of reasonable disagreement." (4) 

 To meet his burden to establish prejudice below, White presented affidavits
and testimony from his investigator, Lester Ray Johnson, purporting to establish that as many as
twenty-seven witnesses who could have vouched for White's whereabouts around the time of
the murder or had knowledge of other potential suspects had died during the intervening years,
and that several of these had died prior to White's indictment. See Marion, 404 U.S. at 321-22
(explaining that prejudice from pre-indictment delay potentially implicates Due Process while post-indictment delay may implicate Sixth Amendment speedy trial protections). This included,
according to Johnson, a potential suspect, Mike Milhelm. Johnson claimed that 90 to 95 percent of
the "leads" he identified had appeared in the police report.

 As for the State's reasons for the delay, White attempted to develop the theme that,
as his trial counsel put it, "[m]ost, if not all, of the cast of characters in this matter were and
are homosexual men" who were vulnerable to the HIV/AIDS epidemic that was ravaging the
gay community during the 1980s. "[W]ith witnesses dying like flies over here because they're all
sharing Acquired Immune Deficiency Syndrome," White complained, the State nonetheless failed
to promptly investigate and prosecute the case despite having sufficient information all along that
would have enabled it to do so. Although trial counsel admitted, "I think we would have to concede
that this was not an intentional delay for the purpose of providing an unfair advantage to the State,"
he urged that the State nonetheless had acted with "conscious indifference" that rose to the level of
"bad faith." This is an apparent reference to concepts that have developed in the Fifth Circuit's case
law applying the purpose prong of the requirement for proving due process violations from pre-indictment delay. The Fifth Circuit, as the court of criminal appeals has explained, "has extended
the second prong of the test" to intentional delays by the government "for other impermissible bad-faith purposes." Id. (citing Crouch, 84 F.3d at 1514). Although appearing at times to apply this
"extension" of the second prong in cases where it determined the requirement had not been met,
see id. (holding that "nothing in the record suggests that the State intentionally delayed the case to
gain a tactical advantage over appellant or otherwise acted in bad faith") (emphasis added), (5)
the court of criminal appeals has never explicitly adopted it. Nor has the court or the Fifth Circuit
defined what other reasons for intentional delay beyond pursuit of tactical advantage might be
considered "in bad faith," although the Fifth Circuit did note that Marion suggested that a purpose
to "harass" the defendant would be included. See Crouch, 84 F.3d at 1514; see also State v. Krizan-Wilson, ___ S.W.3d ___, ____, 2010 Tex. App. LEXIS 4698, at *17 (Tex. App.--Houston
[14th Dist.] June 22, 2010, no pet. h.) (making same observation).

 During the evidentiary hearings on White's motion, White called three
law enforcement officers who had been involved in the Austin Police Department's investigation
of the Desjardins murder at various times, John Cochran, Dusty Hesskew, and Rick Blackmore.
Cochran had been an APD sergeant in 1986 and the lead investigator at the time. Although Cochran
remembered the name of Mike Milhelm as a potential suspect whom "we were talking to," he could
recall little about the investigation, adding that he had transferred out of the APD homicide division
in 1986 or 1987. Cochran testified that he did not think the department had enough evidence in 1986
"to go forward with an indictment." White's counsel elicited the following testimony from Cochran
about the manner in which the investigation was conducted:


Q: Chief[ (6)], at the time y'all were investigating this matter you were aware I'm
sure from the nature of the people involved that this involved mainly gay
males?


A: Yes, sir.


Q: And AIDS was already a problem by '86, wasn't it?


A: Yes, sir.


Q: Was any thought given to the fact that some of these people may start dying
or anything like that during the course of the investigation?


A: Not that I know of. Not that I remember.


Q: That was not a consideration--


A: No, sir.


Q: --in crimes of this sort?


A: No, sir.


Q: Would you say this was a high--did y'all really work this case as much as
you say you would work another high profile case? Can you tell from--


A: Yes, I think we worked it very diligently. We did not slack on this case
because of any particular predetermined errors or anything. It was a
homicide, person who lost their life because of a violent nature and we put
every effort forth in trying to come up with a suspect and file charges.


Q: So what would you hope to gain from maybe delaying the indictment? What
could be gained from the police point of view in terms of delaying seeking
an indictment?


A: I don't know if anything would be gained other than the fact that you would
be able to get more evidence to be able to sustain or get an indictment.



 Hesskew had also been involved in the original investigation. At the time, he had
served as an APD homicide detective. (7) Heskew testified that, during the investigation, he spoke with
Bunch Brittain, whom Hesskew described as an informant or source regarding matters involving the
Austin gay community. Brittain was one of the potential witnesses whom Johnson claimed had died
during the intervening years. Hesskew acknowledged that Brittain had led investigators to many of
the witnesses listed in the police report, including Mike Milheim. Brittain, according to Hesskew,
indicated that Desjardins was obnoxious and pushy, and mentioned Milheim as someone who might
have had a motive to harm him. Hesskew explained that he investigated Milheim "a little bit," but
he "gave most of the Milheim investigation over to Sergeant Cochran." Hesskew's involvement in
the investigation ended in 1986.

 Blackmore was a detective in APD's "Cold Case" Unit. He became involved in
the investigation in December 2002. Detective Blackmore testified that he reviewed the "statements
that were in the case jacket, re-interviewed the previous investigators who had worked on the
case, and then began contacting witnesses who had provided the statements in the original
investigation as well as the new leads." Blackmore's "new leads" included Nancy Keller (a neighbor
of White's who claimed she had heard a scuffle and gunshots coming from White's house on the
night of the murder), the Chalmerses (a couple who had purchased White's house after the murder
and claimed they saw a bullet hole); White's sister, Euna White; and Gary Holley, who, according
to Blackmore, had been "employed as a bartender in a number of the gay bars dating back to the
late '70s" and was able to provide "good information." Blackmore acknowledged that Keller had
made a tip to Crimestoppers in 1986 but had not previously been interviewed. He similarly noted
that Euna White's ex-husband had provided a tip implicating White in 1989 and that efforts had
been made to interview her in 1996. When asked by White's counsel if any of the above evidence
was "in any way unavailable to the investigators by the late '80s," Blackmore conceded that the
witnesses "probably likely would have been available," but he added that he did not think the
investigators had previously been "aware of some witnesses like Gary Holley."

 Detective Blackmore was also asked about a comment to the media, attributed to the
supervisor of the Cold Case Unit, that "time is on our side" in the investigation. Blackmore offered
the following explanation: 


Well, I'll tell you that in cold cases you hear that phrase a lot; whether it's in the
media, whether it's these cold case shows that are on TV and you frequently hear it
from Sergeant Neff in press releases. What his intent by making that statement was
a lot of times over the years loyalties dissolve, people aren't afraid to cooperate with
the investigation when early on they were. I think that is what his--what he meant
by that statement.



 On cross-examination, the State asked Detective Blackmore if he had "any reason
to believe that there was any delay intentionally undertaken to gain some tactical advantage over
the defendant." Blackmore testified, "No. Absolutely not." The State also asked, "Did you have
any reason to believe there was some other--a bad faith purpose?" Blackmore answered, "No,
ma'am." On redirect, White's counsel asked Blackmore to explain the cause of the delay. 
Blackmore testified, "Well, I think the six investigators working all of the current, for lack of a
better word, fresh homicides, all of the suicides, all of these other death investigations and then
also being responsible for working cases, carrying their unsolved cases and finding the time to
work on those." White's counsel then asked, "Bottom line is they were just too busy?" Blackmore
answered, "Yes, sir."

 We agree with the State that there is no evidence to support a finding that the pre-indictment delay in this case was for the purpose of obtaining a tactical advantage or for "other
impermissible bad-faith purposes." Again, White conceded in the district court that "this was not
an intentional delay for the purpose of providing an unfair advantage to the State." And, assuming
without deciding that the court of criminal appeals would adopt the Fifth Circuit's "other
impermissible bad-faith purposes" "extension" of this requirement or has already tacitly done so,
see Ibarra, 11 S.W.3d at 193 (citing Crouch, 84 F.3d at 1514), there is no support for a finding that
the State delayed investigation for "bad faith" or "other impermissible" purposes, as that concept has
heretofore been applied. The gravamen of White's contentions below is that the State should have
placed greater priority to the Desjardins investigation, given the circumstances, compared to other
investigations, (8) and ultimately "just didn't do their job." In Crouch, the Fifth Circuit held that a
similar complaint--investigative delay due to lack of manpower and the "low priority which this
investigation was assigned"--was "fundamentally unlike intentional delay to gain tactical advantage
or for other improper purpose." Crouch, 84 F.3d at 1514. The court further observed that judicial
second-guessing, in the guise of "due process" analysis, of "the merit of resource allocation and
management decisions that are properly the province of the executive and/or legislative branches"
raised grave separation-of-powers concerns. Id. at 1513-14.

 Furthermore, under the cases that have applied the concept, the existence of
some "bad faith" or "improper" purpose cannot be "implied 'simply from the fact of the delay.'" 
Krizan-Wilson, 2010 Tex. App. LEXIS 4698, at *20 (quoting United States v. Proctor, 505 F.3d 366,
370 (5th Cir. 2007)). Nor is the absence of an investigative reason for the delay in itself probative
of bad faith or an "improper" purpose. See id. at *18-21. For example, the Fourteenth Court of
Appeals recently held that a 23-year delay before a new prosecutor "simply looked at the case and
disagreed with the earlier decision not to prosecute" on the same evidence--a delay during which
"the only developments in the case [were] the death of witnesses and defense counsel, the loss of
evidence, and the mental deterioration of the defendant"--was not evidence "that the delay was
intended to gain a tactical advantage over appellee or for another improper purpose." Id. And, as
this Court has observed, "[t]here is no requirement that police conduct a continuous investigation
in a case to prevent a Fifth Amendment violation." Michaelwitz, 186 S.W.3d at 601, 610 (citing
Ibarra, 11 S.W.3d at 193).

 In sum, there is no evidence to support an inference that the 17-year pre-indictment
delay in this case was calculated to obtain a tactical advantage or by the sorts of "bad faith" or
"improper" purposes that could give rise to a Due Process violation. Consequently, the record
does not support the district court's dismissal of the indictment on the grounds that dismissal
was necessary to remedy infringements of White's rights under the Due Process Clause. Ibarra,
11 S.W.3d at 193. We sustain the State's second point of error.


Alleged loss or destruction of evidence favorable to White

 In its third point of error, the State argues that there is no evidence to support
dismissal of the indictment on the ground that the State failed to comply with its obligations
under Brady and Youngblood. Under Brady, a prosecutor has an affirmative duty to turn over
material, favorable evidence to the defense. McFarland v. State, 928 S.W.2d 482, 511 (Tex. Crim.
App. 1996) (citing Brady, 373 U.S. 83). Under Youngblood, the State is required to preserve
evidence that might be expected to play a significant role in the suspect's defense. Little v. State,
991 S.W.2d 864, 866 (Tex. Crim. App. 1999) (citing U.S. v. Binker, 795 F.2d 1218 (5th Cir. 1986);
Youngblood, 488 U.S. 51; and California v. Trombetta, 467 U.S. 479 (1984)). A Brady violation
requires a showing that the undisclosed evidence was both material and favorable to the accused,
see United States v. Bagley, 473 U.S. 667, 684 (1985), while a Youngblood violation requires a
showing of "bad faith" on the part of the State. See Youngblood, 488 U.S. at 58.

 In a supplemental motion, White complained about the failure of the State to preserve
or provide him with any evidence related to Doug Bow, a now-deceased former roommate of White
whom White termed his "chief alibi witness." However, White acknowledged, "It is impossible for
the defense to show that the police department, in bad faith, intentionally destroyed or lost the
evidence of the interviews with the alibi witness as would be required under the federal Youngblood
analysis, nor can we specifically show that the information was exculpatory and was withheld under
Brady, . . ." Nor is there any indication in the record that the State failed to disclose any evidence
related to Bow, or that any evidence related to Bow was favorable or material to White's defense.
The only evidence in the record of Bow's possible relevance to the investigation is the testimony by
Lester Johnson, White's investigator, that Bow "would be a definite alibi witness from the standpoint
he would have witnessed any cleaning or remodeling or redecorating that would have been
done immediately after a crime had been committed there if it had been." However, Johnson did
not testify that he or anyone else had any knowledge of what Bow did or did not witness after
Bow moved into White's apartment, so this testimony is, at best, speculative

 Furthermore, Detective Blackmore testified that the only reference to Bow in the
case file was in an audio recording of a police interview with White. White mentioned Bow during
this interview. However, according to Blackmore, there was no indication in the case file that the
police ever interviewed Bow. Therefore, there was no evidence related to Bow for the State to
disclose, other than the audio recording of White's interview with the police, which Blackmore
agreed to provide if the recording had not already been made available. Finally, although White
asserts that an interview with Bow might have been lost during "computer data base and reporting
system conversions," and Blackmore acknowledged that this happened in some cold cases,
Blackmore believed that this particular case file was "very complete."

 We sustain the State's third point of error.


Texas Constitution

 In its fourth point of error, the State disputes whether the analysis of White's claims
would be any different under the Texas Constitution's Due Course of Law provision, as White has
asserted. In Heitman v. State, the court of criminal appeals held that the "search and seizure"
provision of the Texas Constitution (9) could provide protections that differ from, and are greater
than, those provided under the counterpart provisions of the federal constitution. See 815 S.W.2d
681, 682 (Tex. Crim. App. 1991) ("Under our system of federalism, however, the states are free to
reject federal holdings as long as state action does not fall below the minimum standards provided
by federal constitutional protections. Likewise, a state is free as a matter of its own law to impose
greater restrictions on police activity than those the Supreme Court holds to be necessary upon
federal constitutional standards."). However, in the years since Heitman, while continuing to
acknowledge that the Texas Constitution could in theory provide different or greater protections
than counterpart provisions of the federal constitution, the court of criminal appeals has emphasized
that there must be some basis in the text and history of the Texas provision for so concluding. See,
e.g., Hulit v. State, 982 S.W.2d 431, 434-37 (Tex. Crim. App. 1998); Johnson v. State, 912 S.W.2d
227, 232-36 (Tex. Crim. App. 1995); Autran v. State, 887 S.W.2d 31, 37-39 (Tex. Crim. App. 1994).
We find no such basis here.

 With respect to pre-indictment delay, this Court has already held that complaints
under the Texas Due Course of Law provision are governed by the same standards as those under
the federal Due Process Clause. State v. Moore, 943 S.W.2d 127, 129-30 (Tex. App.--Austin 1997,
no pet.) ("The standards required to show a violation of federal due process rights caused by
preindictment delay, we find, are sound and well-reasoned . . . . These standards are persuasive
and we hold that it is appropriate to apply them to the due course of law provision of the
Texas Constitution in connection with preindictment delay."). Our sister courts have reached similar
conclusions. See, e.g., Griffith v. State, 976 S.W.2d 686, 696 (Tex. App.--Tyler 1997, pet. ref'd);
State v. Kuri, 846 S.W.2d 459, 471 (Tex. App.--Houston [14th Dist.] 1993, pet. ref'd). We see no
basis in the text or history of the Texas Due Course of Law provision that persuades us we should
depart from our holding in Moore, nor does White suggest any. 

 As for loss or destruction of exculpatory evidence, all but one Texas court of appeals,
including this Court, have held that the Due Course of Law provision provides the same protection
as the federal Due Process Clause. See, e.g., State v. Vasquez, 230 S.W.3d 744, 751
(Tex. App.--Houston [14th Dist.] 2007, no pet.); McGee v. State, 210 S.W.3d 702, 705
(Tex. App.--Eastland 2006, no pet.); Salazar v. State, 185 S.W.3d 90, 92 (Tex. App.--San Antonio
2005, no pet.); Jackson v. State, 50 S.W.3d 579, 588-89 (Tex. App.--Fort Worth 2001, pet. ref'd);
Mahaffey v. State, 937 S.W.2d 51, 53 (Tex. App.--Houston [1st Dist.] 1996, no pet.); State v. Rudd,
871 S.W.2d 530, 532-33 (Tex. App.--Dallas 1994, no pet.); Saldana v. State, 783 S.W.2d 22, 23
(Tex. App.--Austin 1990, no pet.). The sole exception is the Waco Court of Appeals, in which a
two-judge majority adopted a balancing test originally formulated in State v. Morales, 657 A.2d 585,
591 (Conn. 1995), that does not require proof of bad faith. See Pena v. State, 166 S.W.3d 274, 281-82 (Tex. App.--Waco 2005), vacated, 191 S.W.3d 133, 145-46 (Tex. Crim. App. 2006), on remand,
Pena v. State, 226 S.W.3d 634, 655 (Tex. App.--Waco 2007), rev'd, 285 S.W.3d 459 (Tex. Crim.
App. 2009). The court of criminal appeals ultimately vacated this holding, however, concluding
that the defendant had not preserved his Due Course of Law ground as a basis for relief. See Pena,
191 S.W.3d at 138. In any event, we respectfully disagree with the Pena majority's analysis. While
the majority concluded that the framers of the Texas Constitution intended article I, section 19 "be
construed as 'practically synonymous' with the [federal] Due Process Clause and with comparable
provisions in the constitutions of other states," see Pena, 226 S.W.3d at 643--a factor that ordinarily
suggests we should construe the two provisions the same way--the majority nevertheless relied on a
notion of "evolving" due process jurisprudence. See id. at 643-45. This reasoning does not persuade
us that we should depart from our holding in Saldana and the majority of our sister courts. 

 We sustain the State's fourth point of error.


CONCLUSION

 Having agreed with the State that there is no evidence to support the district court's
judgment of dismissal with respect to any of the legal theories applicable to the case, we reverse the
judgment of dismissal, reinstate the indictment, and remand for further proceedings.


 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton;

 Chief Justice Law not participating


Reversed and Remanded on Remand


Filed: August 19, 2010


Do Not Publish
1. See State v. White, No. 03-07-00041-CR, 2008 Tex. App. LEXIS 9492, at *1-20
(Tex. App.--Austin Dec. 18, 2008) (not designated for publication), rev'd, 306 S.W.3d 753, 754-60
(Tex. Crim. App. 2010).
2. See Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty,
property, privileges or immunities, or in any manner disfranchised, except by the due course of the
law of the land.").
3. The district court did not enter formal findings of fact and conclusions of law, and it
declined to do so in response to a motion by the State requesting them. However, shortly after
signing its judgment of dismissal, the district court sent the parties an email message in which it
elaborated somewhat on its reasoning. As a technical matter, this email is not part of the appellate
record, see White, 306 S.W.3d at 756-57 & n.9, but the parties do not dispute the email's contents
or origins. In relevant part, the district court stated:


I have tried ancient murder cases and have observed how difficult it is for juries to
ascertain the truth after an extensive passage of time even when the witnesses are still
available. At the proverbial "end of the day" I just do not believe that the defendant
could have a fair trial with the death of so many of the witnesses. I do not find that
the State was in any way at fault in this matter. Therefore, I reluctantly, and with
much hesitation, grant the defense motion to quash the indictment. . . . I do realize
that in doing this I may be doing something I dislike, which is making "new law."


(Emphasis added). To the extent it could be considered an explicit finding of (or failure-to-find) a
historical fact, the district court's statement that "I do not find that the State was in any way at fault
in this matter" would potentially negate each of White's claims for relief, for reasons explained
below. We need not determine the implications of this email, however, because, as we explain
below, the record ultimately does not support the implied findings necessary for White to obtain
relief on any legal theory applicable to this case. We observe nonetheless that the district court's
statement is not inconsistent with our analysis below. 
4. White argues in his brief, "It was shown to the judge's satisfaction, following the
taking and consideration of a great deal of evidence . . . that the lapse of time and its attendant
consequences, including loss of witnesses and the ability to fully investigate the incident, had created
a constitutional violation which could not be remedied by alternate means." During oral argument,
White further emphasized that the presiding judge was a "good judge" who had served many years
and had considered the matter carefully for a long time.
5. This Court has similarly applied the "other bad faith purpose" standard from Crouch in a
case where we held that the evidence did not establish that the State's purpose in pre-indictment
delay had been for the purpose of gaining either a tactical advantage or for "some other bad faith
purpose." State v. Moore, 943 S.W.2d 127, 129 (Tex. App.--Austin 1997, no pet).
6. At the time of his testimony, Cochran was the City of Luling's Chief of Police.
7. At the time of his testimony, Hesskew was an officer with the Austin Independent
School District. 
8. As White's trial counsel reasoned, "And when you're making a conscious delay you're
doing it because there are other things which may be more important to you at the time that you
are going to concentrate on. And of course we know that the Pizza Shop murders occurred relatively
concurrently with this as did the Yogurt Shop. And clearly these guys were otherwise occupied. But
there has to be a limit to this practically speaking."
9. See Tex. Const. art. I, § 9.