UNITED STATES of America,
Plaintiff-Appellee,

v.

Antonio E. NANEZ,
Defendant-Appellant.

No. 82–1155.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1982.

Rehearing and Rehearing En Banc
Denied Jan. 21, 1983.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellant.

Edward C. Prado, U.S. Atty., Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, GEE and HIGGINBOTHAM, Circuit Judges.

GEE, Circuit Judge:

On February 5, 1982, a jury convicted Antonio E. Nanez of conspiracy to possess heroin with intent to distribute, 21 U.S.C. § 846; possession of heroin with intent to distribute, 21 U.S.C. § 841(a)(1); and unlawfully carrying a firearm during the commission of a felony, 18 U.S.C. § 924(c)(2). His punishment was enhanced to 60 years imprisonment and a lifetime special parole by virtue of a previous felony conviction—possession with intent to distribute 19.1 ounces of cocaine.

Pursuant to 28 U.S.C. § 1291, Nanez now appeals both his conviction and enhanced sentence. He argues that the district court trial violated his constitutional and statutory rights in numerous respects. For the reasons enumerated below, we find Nanez' contentions to be without merit. Accordingly, we affirm the decision of the district court.

## I. FACTS

The pertinent facts developed at trial show that in February of 1980, Drug Enforcement Administration (DEA) Agent Joe Losoya, acting undercover, met Raymond Nanez Zaragoza and began negotiating

with Zaragoza for the purchase of a quantity of heroin. Between February and September 3, 1980, Losoya successfully completed several heroin transactions with Zaragoza. On September 3, 1980, Losoya, accompanied by San Antonio, Texas police department narcotics agent Richard Moreno, met with Zaragoza to arrange a purchase. Zaragoza agreed to obtain approximately six or seven ounces of heroin for delivery to the agents on September 4, 1980. Zaragoza said that his "brother,"[1] who managed an ice house, could supply large quantities of heroin.

At approximately 11:00 a.m. on the morning of the 4th the agents went to Zaragoza's house, as agreed. Zaragoza said that he had contacted his "brother" and that the heroin was available; he directed them from his house to Perrera's Ice House at the corner of Durango and Mesquite Streets in downtown San Antonio, which he had said was his brother's business and the place where they were to pick up the heroin. During the drive, Zaragoza repeatedly looked over his shoulder to see if anyone was following.

Appellant Nanez owned this "ice house," and as they approached it, Zaragoza pointed to Nanez' 1978 gray Cadillac which was parked in front of Perrera's, and identified it as belonging to his "brother," the source who could provide large quantities of heroin. The agents parked in the nearby lot of a Church's Fried Chicken Restaurant, and Zaragoza walked to the ice house. After a brief period inside, he returned and told the agents to drive to Lee's Food Store because his "brother" had said that there were a lot of "Federales" in the area and that they would have to move. Again, he repeatedly watched for surveillance agents. Zaragoza made a short telephone call from Lee's to his "brother" and told him that he had checked the area and that it seemed to be

clear. He and the agent then drove to the Steak & Egg Restaurant on North Main Street, where Zaragoza made another call during which he was overheard discussing "La Bicicleta"—the alias of a well-known, large-scale drug trafficker in San Antonio. Zaragoza decided to go back to his house where he was to receive another call from his "brother" to arrange the delivery. He explained to the agents that he felt more secure at his house and had been somewhat apprehensive about this deal because he had been caught once selling drugs to a Mexican undercover agent.

During the drive, Losoya and Zaragoza discussed the price and quality of the heroin. Zaragoza told Losoya that it would cost $750 an ounce for as much as five ounces and that it could be cut approximately three times. About 25 minutes after the men arrived at Zaragoza's residence, Zaragoza received a call. He told the agents that he was going to meet his "brother" and would return shortly. He walked across the street to a washateria where he made another telephone call and then literally ran back to his house. He told the agents that they were to go to the delivery site designated by his "brother" at the corner of Pine and Carson Streets. As they were driving, Zaragoza again repeatedly looked over his shoulder to see if they were being followed.

Upon arrival at the corner of Pine and Carson Streets, Zaragoza said that he was going to get the heroin from the source—his "brother". He got out of the car, walked to the corner, turned, and disappeared from the agents' view for several minutes. As Zaragoza walked back to the car, Moreno observed Nanez driving a green and yellow pickup truck near the intersection. Zaragoza told the agents that he needed the money up front so that he could buy the heroin, but Losoya insisted that he

---

1. The negotiations were conducted in Spanish, and Zaragoza actually used the term "carnal" which in street language means "brother" or "close friend". Zaragoza was actually Appellant's nephew, but the two had been raised together. Appellant contends that the use of this term is sufficiently ambiguous to warrant a

finding that Zaragoza was actually referring to someone other than Nanez. Were the evidence less compelling, such an argument would bear merit. However, on the present facts we are convinced that the phrase was used in reference to Nanez.

needed to see the heroin before he paid for it, so Zaragoza again returned to the corner where he stood at the intersection. After a few minutes, Zaragoza returned, got in the car, and insisted that the agents produce the money "up front." As the green and yellow pickup truck again pulled up to the intersection, Zaragoza pointed to it and said, "There are the boys with the load." At this point, the agents decided that the negotiations for the deal had broken down, as they could not produce the money "up front", and they informed Zaragoza that he was under arrest.

When told that he was under arrest, Zaragoza threw up his arms, a gesture which must have been observed by Nanez, who was watching the agents, since the truck immediately accelerated and departed the area at an extremely high rate of speed. A high-speed chase ensued through downtown San Antonio, and at one point Losoya saw a handkerchief fly from the driver's side of the cab of the truck. He slowed and picked it up. The agents chased the truck to 1300 East Commerce Street; Roberto Casanova, a passenger in the truck, was arrested as he was walking rapidly away from the vehicle and beside a building. Nanez was arrested inside a commercial business at 1300 East Commerce while he was making a telephone call.

Finding no contraband on the two men, the agents retraced the route taken by the truck during the chase and found a .357 revolver and a .22 Derringer near a vacant lot. Both guns were fully loaded and operable. The agents also found 14 packages of heroin, one of which bore Nanez' fingerprint, and a rolled up $5.00 bill. At the DEA office Nanez was advised of his constitutional rights, which he stated that he understood. During processing he told the agents that he and Casanova ran because they had guns and he was on parole. He then requested the opportunity to speak with his lawyer before answering any more questions and questioning ceased.

## II. SUFFICIENCY CF THE EVIDENCE

■ Nanez' first contention is that Zaragoza's extrajudicial statements were im-

properly admitted in evidence. As support, he cites *United States v. James,* 590 F.2d 575 (5th Cir.1979) (en banc), for the proposition that the admission of a coconspirator's extrajudicial statements must be preceded by a showing of independent and substantial evidence of: (1) the existence of a conspiracy, (2) the accused's and the stating coconspirator's involvement in the conspiracy, and (3) that the statement was made in the course and furtherance of the conspiracy. 590 F.2d at 582. While we embrace Nanez' statement of *James,* we find his reliance misplaced.

On the present facts we have no doubt that there was sufficient evidence, independent of Zaragoza's statements, to warrant the presentation of the government's case to the jury. The pattern of prior narcotics transactions, the flurry of telephone conversations on the date of the failed narcotics transaction, and the circumstances surrounding Nanez' arrest all point to the existence of an elaborate plan to violate the narcotics laws. *See United States v. Davis,* 666 F.2d 195, 201 (5th Cir.1982). In addition, Nanez' involvement in the conspiracy was fairly shown.

■ While we have long rejected the proposition that mere presence at the scene of a crime, or close association with an alleged coconspirator, will support an inference of participation in a conspiracy; it is well established that participation and voluntary assent may be inferred from a "development and collocation of circumstances." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Arrendo-Morales,* 624 F.2d 681 (5th Cir.1980); *United States v. Marx,* 635 F.2d 436 (5th Cir.1981). Whether the aggregate of circumstances warrant, in the first instance, the presentation of the government's case to the jury is committed to the discretion of the trial court. It is not our role, as a reviewing court, to substitute our hypothesis of the evidence's import for that of the court below. Rather, it is to evaluate the totality of the evidence and discern whether that court's determination

was based upon substantial and independent evidence. Zaragoza's visit to Nanez' ice house, Nanez' subsequent flight from the scene of the failed transaction, as well as the discovery of packets of heroin and weapons along the chase route, substantiate the trial court's determination that the evidence strongly suggested Nanez' involvement in the conspiracy.

■ Nor are we skeptical of the jury's determination of guilt. In general, no showing of an overt act is necessary in a drug conspiracy prosecution. *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir.1982). The government need only demonstrate beyond a reasonable doubt that an accused knew of and intentionally participated in a conspiracy to violate the narcotics laws. *Davis, supra; see also United States v. Bell*, 678 F.2d 547 (5th Cir.1982) (en banc). The jury's verdict need not respond to every conceivable charge a defense may develop on appeal:

> [a] conviction will not be reversed for lack of evidence that a defendant was acquainted with or knew all of the coconspirators, *United States v. Wilson*, 657 F.2d 755 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982), or lack of evidence that he knew each detail of the conspiracy, *United States v. Rosado-Fernandez*, 614 F.2d 50 (5th Cir.1980), or because he became a member of the conspiracy after its inception, or played only a minor role in the overall scheme. . . .

*United States v. Vergara, supra*, at 61 (some citations omitted). However, it must be responsive to the essential elements of the crime charged.

Here we are satisfied that the jury could reasonably have concluded that the essential elements of the crime of conspiracy, (1) knowledge, (2) intent and (3) participation, were proven. *See Arrendo-Morales, supra*. Similarly, we are convinced that Nanez exercised constructive possession of the heroin. *See United States v. Richards*, 638 F.2d 765 (5th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). In consequence, his conviction of possession with intent to distribute must stand.

## III. POST ARREST STATEMENT

Nanez' second argument is that the admission of his post arrest statement relating to possession of firearms was violative of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition, he contends that the government manipulated this statement so as to reveal to the jury that he had invoked his constitutional privilege of silence. Both arguments are without merit.

### A. *Miranda*

■ Whether Nanez voluntarily waived his *Miranda* rights in making the statement, "I ran because I had guns," is a credibility choice committed to the sound discretion of the trial court. Within this circuit, such a determination will not be disturbed "with[out] the definite and firm conviction that a mistake has been committed." *United States v. Cruz*, 581 F.2d 535, 540 (5th Cir.1978) (en banc). Here the appellant has not met his burden of persuasion. We note that Nanez has presented no evidence to indicate that the trial court's acceptance of the government's characterization of the events leading up to the contested statement was clearly erroneous. *United States v. Saimiento-Rozo*, 676 F.2d 146, 150 (5th Cir.1982). Nor does the record reflect any abuse, threat or any other circumstance from which this court could glean that Nanez' statement was not voluntary and made with full cognizance of his constitutional guarantees. *See Jurek v. Estelle*, 623 F.2d 929, 936 (5th Cir.1980) (en banc), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

### B. *The Doyle Rule*

■ Nanez' argument that the government violated his due process rights by revealing to the jury that he had invoked his privilege of silence is simply misplaced. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), enunciated the general rule that "the due process clause forbids the prosecution to use [post arrest silence] for purposes of impeaching an exculpatory sto-

ry offered at trial." *Chapman v. United States,* 547 F.2d 1240 (5th Cir.1977). Nanez argues that the present action falls within the rubric of *Doyle* and cites *Chapman* as substantiating this proposition. In our view, *Chapman* may only be read as this circuit's refinement of *Doyle.* It goes no further than setting forth the criteria for determining whether prosecutorial use of post arrest silence to impeach an exculpatory story, cited for the first time at trial, is harmless error. *Id.* at 1247–48. Neither *Doyle* or *Chapman* embraces a factual pattern where an accused's post arrest silence is exposed incident to rebuttal of an exculpatory version of post arrest events. *See Doyle, supra,* 426 U.S. at 619–20 n. 11, 96 S.Ct. at 2245 n. 11; *United States v. Fairchild,* 505 F.2d 1378 (5th Cir.1978). If we were to adopt Nanez' stance, the government would be precluded, in every instance, from utilizing statements made subsequent to an accused's apprehension and affirmative acknowledgement of an understanding of his *Miranda* rights, yet prior to an affirmative request for counsel. The creation of such a rule would do little to enhance the concerns of either *Miranda* or *Doyle,* and would permit wholesale manipulation of the judicial process. We cannot countenance such a result.

## IV. PROSECUTORIAL MISCONDUCT

Nanez next contends that the prosecutor (1) bolstered his witnesses, (2) vouched for the government's evidence, (3) implied that prosecution would not have been undertaken unless Nanez was guilty and (4) injected facts not before the jury. The record reflects that the defense posed no objections to these alleged irregularities. In consequence, our review is limited to a consideration of plain error. *United States v. Burnes,* 668 F.2d 855 (5th Cir.1982).

### A. *Prosecutorial Inferences*

In its closing statements the defense argued that the government had fabricated evidence and entrapped the appellant. The prosecutor rejoined, saying:

> I won't put up for any fabricated evidence.... Why would we make up

something like that? If we are going to make up evidence, we are not going to make up minor things like that. We could have said instead of La Bicicleta, Tony Nanez. That certainly would have been bigger evidence. We are not in the business of fabricating evidence. We are in the business of seeing that justice is done, that people that go around selling dope and carrying guns are prosecuted and convicted. That is our job.

In order to hold that the above statements constitute plain error, we must find that (1) the prosecutor intertwined his own personal and official credibility with that of the witnesses, as well as signaling to the jury that prosecution was tantamount to guilt and (2) on the totality of the record, the statements were so egregious and prejudicial as to deprive the defendant of a fair trial. *See Berger v. United States,* 295 U.S. 78, 88–89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *United States v. Herrera,* 531 F.2d 788, 790 (5th Cir.1976); *United States v. Cotton,* 631 F.2d 63, 66 (5th Cir.1980). We are not prepared to make such a determination.

Our reading of the relevant case law confirms that where defense counsel in closing argument attacks the prosecutor, his witnesses, or the work of government agents, the prosecutor, as an advocate, is entitled to make a fair response in rebuttal. *United States v. Hiett,* 581 F.2d 1199, 1204 (5th Cir.1978); *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981). While we may quarrel with the prosecutor's liberal use of pronouns in refuting the defense's charges, we find his statement to be a fair response to the defense's allegations.

### B. *Introduction of Extrinsic Evidence*

The gravamen of this argument is twofold: (1) the prosecutor made references to unknown coconspirators during closing arguments and (2) the government witnesses allegedly presented irrelevant and prejudicial testimony. As to the first contention, the indictment charged that certain named coconspirators as well as persons unknown to the grand jurors conspired to distribute heroin. Thus, the bald statement that oth-

ers were involved in the conspiracy, without more, cannot be said to be the introduction of extrinsic evidence. *See United States v. Albert,* 675 F.2d 712, 714 (5th Cir.1982).

■ Nanez' second point is also addressed by well established legal principles. Admission of evidence and the determination of its relevancy is committed to the sound discretion of the trial court and will not be overturned without a specific determination of substantial prejudice to the defendant. *See Miller v. Universal City Studios, Inc.,* 650 F.2d 1365 (5th Cir.1981). The present record does not reflect substantial prejudice.

## V. UNLAWFUL POSSESSION OF A WEAPON

■ Nanez next contends that the trial court's jury instructions omitted an essential element of 18 U.S.C. § 924(c)(2) by failing to define "unlawfully" carrying a firearm.[2] We agree that the trial court was obligated to guide the jury's analysis by way of defining this statutory term. *See United States v. Risi,* 603 F.2d 1193, 1196–97 (5th Cir.1979). We also note that because the defense neither requested a jury instruction on this point, nor objected to the court's instruction, our standard of review is limited to the existence of plain error. *United States v. Berrojo,* 628 F.2d 368, 370 (5th Cir.1980).

On the present facts, it is inconceivable that Nanez' rights were substantially violated. In *United States v. Elorduy,* 612 F.2d 986 (5th Cir.1980), we examined the interrelationship of § 924(c)(2) and § 46.-02(a) of Vernon's Texas Penal Code, the state firearms statute at issue here.[3] Our

examination revealed that it is a defendant's burden to prove that he comes within one of the enumerated exceptions of § 46.-02(a) and, absent such proof, the government need only show that a defendant was carrying a firearm while committing a felony to establish a *per se* violation of 18 U.S.C. § 924(c)(2). *Id.* at 990–91. Nanez has offered no proof that he came within one of the enumerated exceptions. In consequence, the trial court's error was nonprejudicial.

## VI. THE PLEA AGREEMENT

■ Nanez also advances the somewhat specious argument that the prosecutor prejudicially withdrew from a plea agreement. The record does not support this argument. Our reading of the record shows that the court rejected the agreement because it inhibited its flexibility in imposing sentence. Such a determination is well within the limits of a trial court's discretion. Therefore, it follows that neither the defense nor the prosecution may rely upon the terms of such a plea until it has been approved by the trial court. It also follows that, absent such approval, any argument of prejudicial reliance must necessarily fail. *See* Fed.R. Crim.P. Rule 11; *United States v. Ocanas,* 628 F.2d 353, 358 (5th Cir.1980); *United States v. Aguilera,* 654 F.2d 352, 353 (5th Cir.1981).

## VII. ENHANCEMENT PROCEEDINGS

### A. *Section 851(a)(1)*

■ Nanez' final contention is that the trial court failed to comply with statutory procedural requirements when it imposed his enhanced sentence. The first prong of

---

**2.** 18 U.S.C. § 924(c) provides:
(c) Whoever—
(1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or
(2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not

less than two nor more than twenty-five years and, notwithstanding any other provision of law, the court shall not suspend the sentence in the case of a second or subsequent conviction of such person or give him a probationary sentence, nor shall the term of imprisonment imposed under this subsection run concurrently with any term of imprisonment imposed for the commission of such felony.

**3.** "Section 924(c)(2) is violated if the separate act of carrying a firearm is prohibited by a federal, state, or local law of the area." *Elorduy, supra,* at 990.

this argument is that the government, after duly filing an information of prior convictions pursuant to 21 U.S.C. § 851(a)(1), abandoned the enhancement information during a hearing on the plea agreement.[4] We recognize that if this allegation were true we would be compelled to find that the government had not complied with the literal terms of section 851(a)(1)[5] and, therefore, had not effectively delivered notice of the statute's invocation, resulting in the invalidity of any enhanced sentence. *United States v. Noland,* 495 F.2d 529 (5th Cir. 1974).

The record, however, does not support such a conclusion. The government's abandonment of the enhancement information was clearly contingent upon the trial court's acceptance of the plea agreement. The failure of this contingency, contrary to appellant's argument, did not create the necessity to revive notice of the enhancement information because it simply had not lapsed. Accordingly, we find no breach of the statutory requirements.

### B. *Interrelationship of Sections 851(b) and (e)*

The record reflects that the conviction forming the basis of the enhancement information was more than five years old. *See supra* n. 4. As such, a challenge to its validity appears to be barred by section 851(e):

> No person who stands convicted of an offense under this part [21 USCS §§ 841–851] may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction. 21 U.S.C. § 851(e).

Nevertheless, Nanez, with the record as support, argues that the trial court's failure to inform him that he must challenge the conviction underlying the enhancement information prior to sentencing, if at all, constitutes reversible error. *See* 21 U.S.C. § 851(b).[6] We do not agree.

Elementary rules of statutory construction require a statute to be read in its entirety so that each part has a sensible and intelligent effect which is both harmonious with the whole and consistent with legislative objectives. *Payne v. Panama Canal Co.,* 607 F.2d 155 (5th Cir.1979); *Duke v. University of Texas,* 663 F.2d 522 (5th Cir. 1981).

---

**4.** In accordance with 21 U.S.C. § 851(a)(1), the government filed an enhancement information on October 15, 1980 (R.Vol. I, 50), which set forth the fact that Appellant was convicted in the United States District Court for the Western District of Texas in San Antonio on or about March 24, 1972, in Cause No. SA–72–CR–62 for the offense of possession with intent to distribute 19.1 ounces of cocaine in violation of 21 U.S.C. § 841(a)(1).

**5.** § 851. *Proceedings to establish prior convictions—Information filed by United States Attorney*

(a)(1) No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon. Upon a showing by the United States attorney that facts regarding prior convictions could not with due diligence be obtained prior to trial or before entry of a plea of guilty, the court may postpone the trial or the taking of the plea of guilty for a reasonable period for the purpose of obtaining such facts. Clerical mistakes in the information may be amended at any time prior to the pronouncement of sentence.

(2) An information may not be filed under this section if the increased punishment which may be imposed is imprisonment for a term in excess of three years unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed.

*Affirmation or denial of previous conviction*

(b) If the United States attorney files an information under this section, the court shall after conviction but before pronouncement of sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

**6.** *See supra* n. 4.

Were we to adopt Nanez' position we would be compelled to find that it was Congress' intent that § 851(b) totally vitiate the terms of § 851(e). We cannot embrace such an argument. The only sound approach to a resolution of the interrelationship of these facially conflicting sections is that it was Congress' firm intent to condition, by way of § 851(e), a defendant's right to challenge a prior conviction.

We recognize that our prior decisions indicate that it is doubtful that substantial, rather than literal, compliance with § 851(b) will suffice. *United States v. Cevallos,* 538 F.2d 1122, 1127 (5th Cir.1976); *United States v. Garcia,* 526 F.2d 958 (5th Cir.1976). Those decisions, however, are predicated upon an interpretation of § 851(b), standing alone, and did not seek to assess that section's scope where, as here, challenge of the conviction underlying the enhancement information is statutorily barred. Neither the enhancement statute nor reason requires a trial court to adhere to the rituals of § 851(b) where a defendant, as a matter of law, is precluded from attacking the conviction forming the basis of the enhancement information.

For the reasons stated above, the judgment of the district court is

AFFIRMED.