**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jerry WASHINGTON and Herbert Edward James, Defendants–Appellants.**

**No. 94–40016.**

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1995.

Rife Kimler (Court-appointed), Beaumont, TX, for appellant Washington.

Keith E. Jagmin, Dallas, TX, for appellant James.

John M. Bales, Melissa Baldo, Asst. U.S. Attys., Bob Wortham, U.S. Atty., Beaumont, TX, for appellee.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this direct criminal appeal, Defendants–Appellants Herbert James and Jerry Washington complain that the district court committed several errors, some during their trial and others during their sentencing on numerous counts arising from their involvement in a drug distribution ring. Finding no error, we affirm their convictions and sentences in all respects.

## I

## FACTS AND PROCEEDINGS

James ran a drug distribution ring (the "Ring") from his home in Port Arthur, Texas. To assist in administering various aspects of his business, James retained several "employees," including Washington, Leonard Provost, and Michael Jones. Although the Ring primarily sold small quantities of cocaine base ("crack") to users in that area, over the years it developed a relatively large clientele.

The Ring was finally "busted" as the result of a sting operation orchestrated by the Jefferson County Narcotics Task Force (the "Task Force") which comprised both local and federal enforcement authorities, including the Drug Enforcement Agency ("DEA"). During several months of surveillance and undercover work, the Task Force was able to gather evidence sufficient to constitute probable cause to conclude that James, Washington, and Provost were involved in a conspiracy to possess and distribute crack.

Although the Task Force had long suspected that the Ring sold crack from James' home, authorities had been unable to obtain sufficient evidence to arrest James and his cohorts. The Task Force's luck began to change in May 1992, when a confidential informant ("CI") who used to traffick in narcotics herself contacted a Task Force member, Detective Robert Cartwright, offering information regarding the Ring. But even after obtaining this information, the Task Force still lacked sufficient evidence to arrest and prosecute members of the Ring.

In July 1992, the Task Force obtained another tip from an informant,[1] reporting that the informant had recently observed James selling cocaine from his residence. Based on this information, the police obtained a warrant and searched James' residence, recovering several weapons, ammunition for those weapons, and a clear plastic baggie containing a powdery residue that subsequent tests revealed to be cocaine. Although the police seized the weapons and the baggie, they made no arrests at that time.

In September 1992, the CI again called the Task Force and offered additional information regarding the Ring. This time, Cartwright put the CI in contact with DEA Special Agent Maurice King, another member of the Task Force. After speaking with Agent King, the CI agreed to participate in an undercover sting operation designed to infiltrate the Ring.

The CI knew James and believed that she could convince him to sell crack directly to Agent King. The CI's husband had a nephew living in Louisiana who was roughly the same age as Agent King and who was on probation following his conviction for trafficking in narcotics. The plan was to have Agent King pose as the nephew, with the CI explaining to James that her husband's nephew had recently moved from Louisiana and was going to help her sell crack in Port Arthur.

In late October 1992, the plan was set in motion when the CI and Agent King went to James' house to purchase crack. As planned, the CI approached James and offered to purchase a quarter ounce of crack. Posing as the nephew, Agent King waited in a car in front of James' residence until the CI summoned him to come inside so that she could introduce him to James and his associates, Washington and Provost. After presenting Agent King as her husband's nephew, the CI explained that in the future he

---

1. It is unclear from the record whether this informant was the CI or another person.

would be the person who would purchase and pick up crack for her.

Over the next month or so, the CI and Agent King returned to James' residence several times to order and pick up crack from the Ring. All told, they paid for more than 100 grams of crack, actually taking delivery of over half of that amount. In every instance, the order for or the delivery of the crack, or both, took place in either the garage or the kitchen of James' home.

One objective of the investigation was to have Agent King deal directly with James and other members of the Ring rather than having all transactions funnelled through the CI. Early in the investigation Agent King had completed a deal with James' assistant, Provost; it was not until several transactions later (the one that turned out to be the last successful transaction) that Agent King was able to obtain crack directly from James.

Once Agent King was able to deal directly with James, the focus of the Task Force investigation shifted to determining whether the Ring could supply a larger quantity of crack. Up to that point, neither the CI nor Agent King had placed an individual order for more than one-half ounce of crack, so Agent King and the CI set out to determine whether James could supply at least two ounces of crack. The CI offered James $1200 for that amount, and James accepted the offer.

At this point, however, the undercover plan went awry. Agent King stopped by James' house to pay for the two ounces of crack, but mistakenly gave James $1600 rather than the $1200 negotiated by the CI. As a result, James became suspicious and confronted the CI, telling her that he thought Agent King was a policeman. Concerned that Agent King's cover had been blown, the

Task Force decided to end its undercover operation and arrest the members of the Ring on the strength of evidence accumulated to date.

The Task Force obtained warrants to arrest James and to search his home; and, on December 7, the police entered and searched James' residence. Even though the search yielded no narcotics, the Task Force did recover numerous weapons and abundant evidence of drug trafficking activity including a portable scale, several radio scanners capable of monitoring police frequencies, and a soda can containing a secret compartment in which narcotics could be hidden. James returned to his home while the search was in progress, whereupon he was taken into custody and advised of his rights. Washington and Provost were arrested later.

In January 1993, a grand jury returned a sixteen-count indictment (subsequently superseded by an eighteen-count indictment) that charged James, Washington, and Provost as codefendants in a conspiracy to distribute and possess crack.[2] Additionally, James was charged with (a) four counts of possession with intent to distribute crack,[3] (b) one count of attempting to possess with intent to distribute crack,[4] (c) five counts of use of or carrying a firearm during and in relation to a drug trafficking crime,[5] and (d) three counts of possession of a firearm by a convicted felon.[6] In addition to the conspiracy count, Washington was charged with use of or carrying a firearm during and in relation to a drug trafficking crime,[7] and Provost was named in one count of possession with intent to distribute crack.[8]

Provost began to cooperate with the Task Force almost immediately after he was taken into custody. He agreed to plead guilty to one count of possession with intent to distribute crack and to cooperate with the govern-

---

**2.** 21 U.S.C. §§ 841(a)(1), 846 (1988).

**3.** *Id.* §§ 841(a)(1), 841(b)(1)(B)(iii).

**4.** *Id.* §§ 841(b)(1)(A), 846.

**5.** 18 U.S.C. § 924(c)(1). The jury convicted James on all five counts, but the government dismissed three of these counts before the district court entered judgment. In that judgment, the district court incorrectly listed James' offense as a violation of § 922(c)(1), but in both the indictment and the description of the offense in that

judgment it is clear that James was convicted of violating § 924(c)(1).

**6.** *Id.* § 922(g). When the government dismissed the three § 924(c) counts, it also dropped two of these § 922(g) counts.

**7.** *Id.* § 924(c)(1).

**8.** 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii).

ment, in exchange for which the government agreed to dismiss his conspiracy charge.

At trial, the government introduced an overwhelming amount of evidence establishing James' and Washington's guilt. In addition to substantial physical evidence, the government proffered numerous witnesses, two of whom—Provost and Michael Jones—were former members of the Ring. The CI and Agent King also testified regarding the crack purchases they had made from the Ring at James' residence.

Based on this and all other evidence, the jury found James and Washington guilty on all counts. The district court sentenced James to a total of life imprisonment plus twenty-five years (followed by a period of supervised release), and Washington was sentenced to a total of 295 months imprisonment (followed by a period of supervised release). After sentencing, Washington moved for a new trial charging that the government did not produce certain evidence that would have tended to impeach the credibility of two government witnesses—the CI and Cartwright. The court considered arguments from each counsel as to the importance of this newly discovered information, then denied Washington's motion for a new trial. This appeal followed, with Washington proceeding in forma pauperis.

## II

## ANALYSIS

■ On appeal, both James and Washington raise numerous points of error. We address seriatim those having facial merit.[9]

9. James also claims that the crack-powder cocaine sentencing scheme violates equal protection and urges that the evidence is insufficient to support his conviction on two counts of violating 18 U.S.C. § 924(c), but neither argument has merit under the well-settled law of this circuit. See, e.g., United States v. Watson, 953 F.2d 895, 896 (5th Cir.) (sentencing scheme not violative of equal protection), cert. denied, ⸺ U.S. ⸺, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992); United States v. Beverly, 921 F.2d 559, 562–63 (5th Cir. 1991) (per curiam) (on similar facts, evidence sufficient to support § 924(c) conviction); United States v. Molinar–Apodaca, 889 F.2d 1417, 1419–23 (5th Cir.1989) (same).

Both James and Washington complain that the district court used unreliable information in determining that they trafficked in more than 1.5 kilograms of crack—the quantity of crack from

## A. JAMES

### 1. Right of Allocution

James contends that the district court failed to afford him the right of allocution: He insists that the judge did not ascertain directly from James whether he wished to exercise his right personally to address the court. This omission, contends James, mandates that we remand for resentencing so that he can exercise this "absolute" right.

■ Federal Rule of Criminal Procedure 32(a)(1)(C) requires that a sentencing court "address the defendant personally and determine if the defendant wishes to make a statement and present any information in mitigation of the sentence." The Supreme Court has admonished that "trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing."[10] If the defendant is not afforded the opportunity personally to speak in his own behalf before sentence is imposed, then " 'resentencing is required.' "[11]

■ Prior to sentencing James, the district judge stated, "[b]efore sentence is imposed, I'll hear from Mr. James and from Mr. Jagmin" (James' counsel). "First, Mr. James, or whichever way you want to do it. Mr. Jagmin." James' counsel responded by pleading for the imposition of the minimum sentence required under the United States Sentencing Commission Guidelines ("Guide-

which each defendant's base offense level was calculated—but the record utterly refutes their contention. See United States v. George, 911 F.2d 1028, 1030 (5th Cir.1990) (per curiam) (stating that "the court is not confined solely to matters included in [the presentencing investigation report] and may base 'its sentencing decisions on matters not raised in [that report].' " (quotation omitted)).

10. Green v. United States, 365 U.S. 301, 305, 81 S.Ct. 653, 655–56, 5 L.Ed.2d 670 (1961).

11. United States v. Anderson, 987 F.2d 251, 261 (5th Cir.) (quoting United States v. Dominguez–Hernandez, 934 F.2d 598, 599 (5th Cir.1991)), cert. denied, ⸺ U.S. ⸺, 114 S.Ct. 157, 126 L.Ed.2d 118 (1993).

lines"). After listening to Jagmin's entreaty, the district judge responded that he would sentence James to the minimum sentence required by law and then proceeded to do so, without renewing his previous offer to James personally to address the court. After sentencing James, the district judge concluded the proceeding by asking, "Is there anything further, Mr. Jagmin?," to which Mr. Jagmin responded, "No, your Honor." Neither Jagmin nor James objected to the judge's failure to issue a second invitation to James to speak to the court before being sentenced.

The judge's failure to renew his offer of allocution, urges James, offends Rule 32(a)(1)(C). We disagree, finding most persuasive the reasoning of the Seventh Circuit in *United States v. Franklin*.[12] In that appeal, the circuit court faced a factual situation essentially indistinguishable from James' and held that a district judge's failure to renew a previous offer of allocution does not violate Rule 32. We, like the Seventh Circuit before us, do not believe that Rule 32 requires "[t]he district court ... to renew his invitation or inquire why [the defendant] did not accept his invitation."[13]

In *Franklin*, the sentencing judge stated prior to sentencing: "All right, *Mr. Rose (defendant's attorney) and Mr. Anderson [the defendant], do either or both of you have any statement that you want to make in mitigation of sentence* that the court ought to consider in determining the appropriate sentence in this case?"[14] Anderson's counsel then proceeded to make a presentation to the court, arguing for a sentence in the lower range of the Guidelines. The sentencing judge then asked Anderson's counsel to comment on two issues that were troubling to the court; counsel responded; and the court then spoke to the prosecution. The judge again addressed defense counsel and asked, "[i]s there anything you want to state further, Mr. Rose?" Mr. Rose added nothing,

and the court proceeded to sentence Anderson.

The Seventh Circuit held that, inasmuch as the district court addressed the defendant by name and asked whether he had anything to say in mitigation of his sentence, Rule 32(a)(1)(C) had been satisfied. That court distinguished the circumstances before it from those in which the judge's failure to address the defendant by name necessitates a remand for resentencing.[15] The *Franklin* court expressly rejected the notion that when a defendant's counsel responds first to the court's otherwise-adequate offer of allocution, Rule 32(a)(1)(C) requires that the district judge renew his personal invitation to the defendant after defendant's counsel has spoken to the court. In words equally applicable here, the Seventh Circuit stated:

> Wisely, neither Rule 32(a)(1)(C) nor any case law requires such a rigid procedural formula. Neither [the defendant] nor his counsel indicated that [the defendant] wished to accept the court's invitation to speak on his own behalf. Since the district judge was not required to renew his invitation or inquire why [the defendant] did not accept his invitation, [the defendant] was not denied his right of allocution.[16]

As in *Franklin*, the record in the instant case makes unquestionably clear that before sentencing the trial judge invited James, *by name*, to address the court. We are satisfied that by so doing, James could not have helped but understand that he had been issued a personal invitation by the trial judge to speak to the court before being sentenced; James merely failed, or by his silence declined, to avail himself of the opportunity to do so.

### 2. *Prosecutorial Misconduct: Closing Argument*

James complains that his trial was fundamentally unfair because the prosecution

---

**12.** 902 F.2d 501 (7th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990).

**13.** *Id.* at 507.

**14.** *Id.* (alteration and emphasis in original).

**15.** *Id.* (citing *United States v. Van Drunen*, 501 F.2d 1393, 1399 (7th Cir.), *cert. denied*, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974) and *United States v. Posner*, 868 F.2d 720, 724 (5th Cir.1989)).

**16.** *Id.*

made several statements during closing argument to the jury that, according to James, vouched for the credibility of government witnesses and challenged the veracity of defense witnesses. As James did not object to these statements contemporaneously or otherwise object prior to appeal, "we must consider [first] whether the statements were improper and, if so, [second] whether they amounted to plain error under Fed.R.Crim.P. 52(a)." [17]

### a. *Propriety of the Statements*

■ The law is clear that in closing argument a prosecutor may not personally vouch for the credibility of a government witness, as doing so may imply that the prosecutor has additional personal knowledge about the witness and facts that confirm such witness' testimony, or may add credence to such witness' testimony.[18] James complains that the prosecution violated this clear prohibition three times: (1) when in summarizing the responsibility of cooperating witnesses the prosecutor stated, "[t]heir obligation is to cooperate and tell the truth"; (2) by commenting that, *"[w]e're not exaggerating, we're telling you exactly what happened"* (emphasis added); and (3) after questioning rhetorically whether a government witness, Jones, was "making up" stories, the prosecutor answered his own question by responding, *"I don't think so"* (emphasis added). Although at first blush—and taken out of context—several of the prosecutor's statements might appear to be impermissible vouching, when viewed in the context in which they were made, we see clearly that no

such personal assurances were offered by government counsel.

■ "We must review the allegedly improper argument 'in light of the argument to which it responded.'"[19] During trial, defense counsel contended that the plea agreements between government witnesses and the prosecution invited the witnesses to perjure themselves so as to procure lesser sentences. In such circumstances, "the government 'may even present what amounts to bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon [the prosecutor] or his witnesses.'"[20] Even if these statements were tantamount to bolstering, such bolstering would not have been improper in this case.

But we do not believe that the prosecution's reference to the obligations of cooperating witnesses did amount to bolstering. Taken in context, the prosecution merely argued that the plea agreements, which had been entered into evidence, provided little motivation for cooperating witnesses to testify falsely. A prosecutor is not forbidden to argue that " 'the fair inference from the facts presented is that a witness has no reason to lie.'"[21]

■ Moreover, a prosecutor is not prohibited from "recit[ing] to the jury those inferences and conclusions he wishes [the jury] to draw from the evidence so long as those inferences are grounded upon the evidence."[22] In each of the other two instances

---

**17.** *United States v. Thomas,* 12 F.3d 1350, 1367 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1861, 128 L.Ed.2d 483 *and* —— U.S. ——, 114 S.Ct. 2119, 128 L.Ed.2d 676 (1994); *United States v. Carter,* 953 F.2d 1449, 1460 (5th Cir.) (when defendant does not object to statements at trial, "we will reverse only if the comments rise to the level of plain error"), *cert. denied,* —— U.S. ——, 112 S.Ct. 2980, 119 L.Ed.2d 598 (1992); *United States v. Simpson,* 901 F.2d 1223, 1227 (5th Cir.1990) ("If the defendant has not objected to the portion of the closing argument he challenges on appeal, we review only for plain error."), *cert. denied,* —— U.S. ——, 114 S.Ct. 486, 126 L.Ed.2d 436 (1993).

**18.** *See Carter,* 953 F.2d at 1460.

**19.** *Thomas,* 12 F.3d at 1367.

**20.** *Id.* (quoting *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981)).

**21.** *See United States v. Saenz,* 747 F.2d 930, 940 (5th Cir.1984) (quoting *United States v. Bright,* 630 F.2d 804, 824 (5th Cir.1980)), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *see also United States v. Robles–Pantoja,* 887 F.2d 1250, 1256 (5th Cir.1989) (stating that prosecutor did not bolster his witnesses, rather he merely urged jury to assess motives and bias of prosecution witnesses as they would assess those of any witness).

**22.** *United States v. Loney,* 959 F.2d 1332, 1343 (5th Cir.1992); *United States v. Webb,* 950 F.2d 226, 230 (5th Cir.1991) (per curiam), *cert. denied,* —— U.S. ——, 112 S.Ct. 2316, 119 L.Ed.2d 236 (1992).

of alleged bolstering, that is clearly all that the prosecution was attempting to do. When the prosecution commented, "we're not exaggerating," and "I don't think so," it was inviting the jury to compare the credibility of the government's witnesses with that of those who testified for the defense, even though we concede that the prosecutor's choice of the first person pronouns may have been a bit unfortunate. The purpose of closing argument is to assist the jury in analyzing and evaluating the evidence,[23] and we are convinced that here the prosecution did nothing more.

■ We also find meritless James' argument the prosecution improperly offered its personal view of the credibility of defense witnesses in two other instances when the prosecution ventured the opinions that one defense witness was "lying," and that another defense witness "was not being truthful." Taken in context, these two statements are merely further examples of the prosecution's reciting evidence in the record—this time, conflicting evidence—and then attempting to persuade the jury to arrive at a certain conclusion based on that evidence. There is nothing impermissible about a prosecutor's pointing out inconsistent facts or testimony in the record and arguing that the jury should adopt a particular conclusion based on that evidence.[24] Given the evidence before

the jury, therefore, we find nothing inappropriate about the prosecution's comments in closing argument.

### b. *Plain Error*

■ Even assuming arguendo that we were to find any or all of these statements improper, such a finding would not here require reversal. Reversal for plain error is required only when the error is prejudicial, *i.e.*, "it must have affected the outcome of the District Court proceedings."[25] In determining the overall degree of prejudice in a prosecutor's closing argument, we consider the district court's cautionary instructions to the jury[26] and the strength of the evidence against each defendant.[27] In light of the district court's proper jury instruction and the quantum of evidence establishing guilt, any putatively improper closing argument by the prosecutor here certainly would not rise to the level of plain error.

### 3. *Sentencing Entrapment*

We also reject James' contention that his right to due process was violated by the Task Force when it delayed arrest and ordered more crack, for the purported purpose of exposing James to a longer term of incarceration under the Guidelines. This "trendy" argument appears to be in vogue currently;

---

**23.** *See United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. Unit B Dec. 28, 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 *and* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).

**24.** *See Loney*, 959 F.2d at 1343 (stating that it was not impermissible to call defendant a "liar" based on evidence that indicated that defendant's statements and actions were not consistent).

**25.** *United States v. Olano*, — U.S. —, —, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); *see* FED.R.CRIM.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *see, e.g., Bradford v. Whitley*, 953 F.2d 1008, 1013 (5th Cir.) (referring to defendant as "liar" no violation of substantive rights in context of entire closing argument), *cert. denied*, — U.S. —, 113 S.Ct. 91, 121 L.Ed.2d 53 (1992); *United States v. Nanez*, 694 F.2d 405, 410 (5th Cir.1982) (holding that for bolstering to constitute plain error, the prosecutor must have "intertwined his own personal and official credi-

bility with that of the witnesses"), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983).

**26.** *See, e.g., United States v. Andrews*, 22 F.3d 1328, 1343 n. 16 (5th Cir.) (stating that we have held that "an improper statement by the prosecutor was harmless, in light of the district court's instruction that 'the attorneys' statements are not evidence to be considered by the jury.'" (quoting *United States v. Morris*, 568 F.2d 396, 402 (5th Cir.1978)), *cert. denied*, — U.S. —, 115 S.Ct. 346, 130 L.Ed.2d 302 (1994).

**27.** *United States v. Carter*, 953 F.2d 1449, 1457 (5th Cir.) (considering magnitude of the prejudicial effect of the statements, efficacy of cautionary instructions, and strength of evidence of guilt), *cert. denied*, — U.S. —, 112 S.Ct. 2980, 119 L.Ed.2d 598 (1992); *United States v. Simpson*, 901 F.2d 1223, 1227 (5th Cir.1990) (same), *cert. denied*, — U.S. —, 114 S.Ct. 486, 126 L.Ed.2d 436 (1993); *see, e.g., United States v. Robles–Pantoja*, 887 F.2d 1250, 1256 (5th Cir. 1989).

it has recently been proffered by numerous defendants around the country, being referred to variously by the courts as "sentencing entrapment" or "sentencing factor manipulation."[28] Until now, however, we have not had occasion to address the viability of this proposition, and we conclude that we need not do so today given the facts before us.

Two witnesses testified that James actually supplied crack in an aggregate quantity *far greater* than the amount that he now alleges the government continued to purchase over time for the purpose of increasing the quantity of drugs for which he could be sentenced. Such testimony alone refutes any claim that James was predisposed to deal only in a cumulative quantity smaller than the total amount purchased by the government.[29]

### 4. Sentencing Guidelines

James also advances several points of error regarding his sentence under the Guidelines. We review de novo a district court's application of the Guidelines, but will

reverse factual findings made during sentencing only if they are clearly erroneous.[30]

#### a. § 2D1.1 Enhancement

James first contends that the district court erroneously enhanced his sentence two levels under § 2D1.1 for his possession of a firearm during a drug trafficking offense. He complains that the district court "double counted" by first convicting him of two counts under § 924(c) for the possession of two firearms and then enhancing his sentence under § 2D1.1 for possessing a firearm in a drug trafficking offense. True, a sentencing court may not enhance a drug trafficking sentence based on a defendant's possession of a firearm if the defendant also is convicted under § 924(c) for the possession of that *same* firearm.[31] But no such double counting occurred here.

James was convicted under § 924(c) based on his use of or carrying two specific guns: a Sundance Model A–25, .25 caliber pistol, and a Companhia Brasileira De Cartuchos Model SB, 12 gauge shotgun. But his sentence was enhanced under § 2D1.1 be-

**28.** We are aware of only one case, *United States v. Staufer*, 38 F.3d 1103, 1107–08 (9th Cir.1994), in which a federal court of appeals has reversed a sentence based on a finding that the defendant was subjected to sentencing entrapment. The Eighth Circuit appears to have adopted the theory, *United States v. Barth*, 990 F.2d 422, 425 (8th Cir.1993), and the Eleventh Circuit has expressly rejected it, *United States v. Williams*, 954 F.2d 668, 672–73 (11th Cir.1993). Many of the remaining circuit courts of appeals, including ours, have not yet been presented with facts requiring that they squarely address this issue. *See, e.g., United States v. Brewster*, 1 F.3d 51, 55 n. 5 (1st Cir.1993); *United States v. Rosa*, 17 F.3d 1531, 1551 (2d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994); *United States v. Raven*, 39 F.3d 428, 438 (3d Cir.1994); *United States v. Jones*, 18 F.3d 1145, 1154 (4th Cir. 1994); *United States v. Murphy*, 16 F.3d 1222 (6th Cir.1994) (table opinion) (unpublished) (text available 1994 WL 18008, at *4); *United States v. Cotts*, 14 F.3d 300, 306 n. 2 (7th Cir.1994); *Baughman v. United States*, 992 F.2d 1222 (10th Cir.1993) (table opinion) (unpublished) (text available 1993 WL 141198, at *1).

**29.** *Barth*, 990 F.2d at 424 (defining "sentencing entrapment" as " ' "outrageous official conduct [that] overcomes the will of an individual predisposed only to dealing in small quantities for the purpose of increasing the amount of drugs . . .

and the resulting sentence of the entrapped defendant." ' " (quotations omitted)); *see Staufer*, 38 F.3d at 1106 ("Sentencing enhancement or 'sentencing factor manipulation' occurs when a 'defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.' " (quotation omitted)).

**30.** *See United States v. Wimbish*, 980 F.2d 312, 313 (5th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2365, 124 L.Ed.2d 272 (1993).

**31.** *See United States v. Rodgers*, 981 F.2d 497, 500 (11th Cir.1993) (per curiam) (improper to convict under § 924(c) and to enhance sentence based on possession of the same weapon); *United States v. Harris*, 959 F.2d 246, 266 (D.C.Cir.) (per curiam) (same), *cert. denied*, — U.S. —, 113 S.Ct. 362, 121 L.Ed.2d 275 *and* — U.S. —, 113 S.Ct. 364, 121 L.Ed.2d 277 (1992); *cf. United States v. Cabral–Castillo*, 35 F.3d 182, 188 (5th Cir.1994) (discussing double counting), *cert. denied*, — U.S. —, 115 S.Ct. 1157, 130 L.Ed.2d 1113 (1995); *see also* U.S.S.G. § 2K2.4 commentary ("Where a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm . . . is not to be

cause the court found that James armed Washington with a third gun belonging to James—a blue-steel, .25 caliber, semi-automatic handgun—so that Washington could protect himself and his drugs while conducting a particular drug transaction. James was neither indicted nor convicted under § 924(c) for the use of or carrying that pistol. The district court therefore did not make a double-counting error in enhancing James' sentence under § 2D1.1 based on its finding that James' codefendant, Washington, possessed that pistol during a drug trafficking offense.[32] As the Eleventh Circuit recently explained, under such circumstances an enhancement is entirely proper because two armed men pose a much greater threat to public safety than does one.[33]

### b. James' Role in the Offense

■ James also contests the district court's increase of his base offense level by four on its finding that he was the "organizer and leader of a criminal activity that had five or more participants."[34] James complains in particular that there is insufficient evidence to support a finding that he supervised five participants in the Ring, which James claims is a prerequisite of this enhancement. But we have held that proof that a defendant supervised only one other culpable participant is sufficient to make that defendant eligible for this enhancement,[35] and here the evidence proves that James supervised three at a minimum: Washington, Provost, and Michael Jones.

### B. WASHINGTON

#### 1. Brady Violation

Washington claims that he was denied a fair trial because the government failed to disclose evidence tending to impeach the credibility of two government witnesses—the CI and Cartwright. In particular, Washington complains that the prosecution failed to disclose evidence that Cartwright—and possibly an Assistant U.S. Attorney ("AUSA") as well—had asked a Texas parole board to stop its revocation proceedings against the CI. The government's failure to disclose that information, concludes Washington, requires that his conviction be overturned. We are not convinced.

In Brady v. Maryland,[36] the Supreme Court stated that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "Impeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule."[37]

■ For cases involving prosecutorial failure to disclose evidence favorable to the accused (such as the impeachment evidence at issue here), "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[38]

applied in respect to the guideline for the underlying offense.").

**32.** See United States v. Kimmons, 965 F.2d 1001, 1011 (11th Cir.1992) (sentence enhancement not improper when § 2B3.1 enhancement and § 924(c) conviction did not involve the same firearm or the same possession), vacated and remanded on other grounds, — U.S. —, 113 S.Ct. 2326, 124 L.Ed.2d 239 (1993), reinstated on remand, 1 F.3d 1144 (11th Cir.1993).

**33.** Id.

**34.** U.S.S.G. § 3B1.1(a) (enhance base offense level four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.").

**35.** United States v. Okoli, 20 F.3d 615, 616 (5th Cir.1994).

**36.** 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

**37.** United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (citing Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)).

**38.** Id. at 682, 105 S.Ct. at 3383 (plurality) and id. at 685, 105 S.Ct. at 3385 (White, J., concurring); see id. at 677, 105 S.Ct. at 3381 ("A finding of materiality of the evidence is required under Brady. . . . A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .'" (quotations omitted)).

When we consider the record as a whole, our confidence in the outcome of this case is not shaken by this newly discovered information. Indeed, considerable other evidence was presented to the jury to show that the CI may have been biased or may have had an interest in testifying for the government. At trial it was revealed, for example, that the CI was paid for expenses incurred during her work as an informant, and that another AUSA wrote to a Parish District Attorney's office in Louisiana to request that she receive favorable treatment. The CI also testified as to her belief that the reason the parole board did not revoke her parole was her decision to participate in the Task Force's investigation and to testify in this case.[39] Information that Cartwright (or even an AUSA) had contacted a Parole Board to try to stop revocation proceedings would merely have been cumulative of the CI's own testimony in this regard.

Neither are we convinced that either James or Washington would have been acquitted had this undisclosed information been made available to the defense to impeach Cartwright. The record makes clear that Cartwright was a relatively insignificant witness,[40] whose testimony was limited primarily to the chain of custody of the narcotics and events regarding the apprehension and arrest of James; and neither James nor Washington contest Cartwright's version of the facts surrounding either of those events.

We also reject Washington's contention that his conviction should be overturned as the product of the knowing use of perjured testimony.[41] We first note that there is no evidence that the prosecution knowingly

used perjured testimony; as the district court found, Washington merely "out discovered" the government. Moreover, even though after trial two parole board employees contradicted Cartwright's testimony that he did not try to influence the parole board's proceedings, that alone does not prove that Cartwright's testimony was perjurious. Inconsistency of testimony among witnesses can as easily be explained as the result of faulty recollections or differences of opinions. And, even if there was some lying going on, who is to say that Cartwright was the liar?

Even more important, however, is the fact that Cartwright's allegedly perjurious statements have nothing to do with Washington's guilt or innocence; rather, they concern a completely collateral matter—whether Cartwright attempted to intercede in the parole board's deliberations on behalf of the CI. Reversal is required only if the testimony is material, i.e., if its use "creates a reasonable likelihood that the jury's verdict might have been different." [42] Given the extremely tangential nature of this undisclosed information, the limited scope of Cartwright's testimony at trial, and the overwhelming quantity and quality of the other evidence in the record supporting the jury's verdict, we conclude that Cartwright's testimony—even if perjurious—"does not cast 'serious doubt' upon the correctness of the jury verdict or the fairness of the trial." [43]

2. *Evidentiary Rulings: Opinion Testimony*

Washington also contends that the district court reversibly erred in admit-

---

39. The CI testified as follows:

> Q: You think your testimony in this case and your work with the DEA has something to do with your not having your parole revoked?
> A: Sure, I believe that.
> Q: It does, doesn't it?
> A: Yes.

40. We note that Provost, the CI, Agent King and, to a lesser extent, Michael Jones, provided the most damaging testimony against James and Washington.

41. *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir.1978) (stating that "the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process"); *see United States v. Bermea*, 30 F.3d 1539, 1565 (5th Cir.1994) (quoting *Anderson* ).

42. *Bermea*, 30 F.3d at 1565.

43. *Id.* (quoting *United States v. Willis*, 6 F.3d 257, 263 (5th Cir.1994)).

ting five "expert" opinions by two government agents and the CI regarding the operations and methods of drug trafficking.[44] The rule is well-established that an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business,[45] as such testimony often is helpful in assisting the trier of fact understand the evidence.[46] Here, the trial court did not abuse its discretion in admitting the subject opinions into evidence.[47]

But even if admitting any or all of the questioned opinion testimony had been error, reversal would not be required. To repeat, the government presented overwhelming evidence establishing Washington's guilt; thus any error that the court may have made in admitting those snippets of opinion was harmless.[48]

## III

## CONCLUSION

Finding no reversible error, we affirm in all respects the convictions and sentences of James and Washington.

**44.** Washington's argument could also be interpreted to challenge the testimony as impermissible profile evidence. *United States v. Williams*, 957 F.2d 1238, 1240–41 (5th Cir.1992); *see United States v. Speer*, 30 F.3d 605, 610 n. 3 (5th Cir.1994). The record makes clear, however, that those opinions were not offered for that purpose. *Compare Williams*, 957 F.2d at 1241–42 (finding government introduced and argued evidence in a manner to prove substantive guilt based on defendant's similarity to profile) *with Speer*, 30 F.3d at 610 & n. 3 (concluding that witness merely analyzed evidence in light of his special knowledge as an expert in narcotics trafficking).

**45.** *United States v. Kusek*, 844 F.2d 942, 949 (2d Cir.) (stating that " '[t]he operations of narcotics dealers are a proper subject for expert testimony under Rule 702' " (quotation omitted)), *cert. denied*, 488 U.S. 860, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988); *accord United States v. DeSoto*, 885 F.2d 354, 360 (7th Cir.1989); *United States v. Espinosa*, 827 F.2d 604, 612 (9th Cir.1987), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988); *see, e.g., Speer*, 30 F.3d at 609 (DEA agent's testimony that possession of scale and 30 grams of cocaine is consistent with drug trafficking); *United States v. Boney*, 977 F.2d 624, 631 (D.C.Cir.1992) (officer's testimony matching particular defendants and their actions with paradigm roles in a cocaine sale); *United States v. Armendariz–Mata*, 949 F.2d 151, 155 (5th Cir. 1991) (DEA agent's testimony as to the meaning of certain "code words" and significance of some of defendant's actions), *cert. denied*, — U.S. ——, 112 S.Ct. 2288, 119 L.Ed.2d 212 (1992); *United States v. Dunn*, 846 F.2d 761, 762

(D.C.Cir.1988) (no abuse of discretion to allow expert to testify that nature of activities in a townhouse suggested "a retail operation used for the everyday distribution, distributing of primarily crack and heroin"); *Espinosa*, 827 F.2d at 611–13 (no abuse of discretion to permit officer to state that in his opinion trade of packages was an exchange of narcotics for money); *United States v. Young*, 745 F.2d 733, 760–61 (2d Cir. 1984) (testimony regarding paraphernalia one would expect to find in a heroin "mill"), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.1983) (no abuse of discretion to permit agents to testify that defendant's furtive activity appeared to them to be sale of narcotics), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).

**46.** FED.R.EVID. 702 (stating that witnesses with specialized knowledge may express an opinion where such knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue"); *see* FED.R.EVID. 701 (providing that lay witnesses may express opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue").

**47.** *Speer*, 30 F.3d at 609 (quoting *Williams*, 957 F.2d at 1240–41).

**48.** *See Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059–60, 31 L.Ed.2d 340 (1972); *United States v. Lui*, 941 F.2d 844, 848 (9th Cir.1991).